29 N.J. Super. 422 (1954)
102 A.2d 671
IN THE MATTER OF FORMAL COMPLAINT OF TOWNSHIP OF LAKEWOOD
v.
LAKEWOOD WATER COMPANY  IN RE REFUSAL TO EXTEND SEWERAGE FACILITIES IN THE TOWNSHIP OF LAKEWOOD.
TOWNSHIP OF LAKEWOOD, APPELLANT,
v.
LAKEWOOD WATER COMPANY AND BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1953.
Decided February 4, 1954.
*425 Before Judges JAYNE, FRANCIS and SMALLEY.
Mr. Joseph M. Jacobs argued the cause for the appellant (Messrs. Stoffer and Jacobs, attorneys; Mr. Joseph Harrison, of counsel).
Mr. Sidney P. McCord, Jr., argued the cause for the respondent Lakewood Water Company (Messrs. Starr, Summerill & Davis, attorneys; Mr. William F. Hyland, on the brief).
The opinion of the court was delivered by FRANCIS, J.A.D.
Appellant, Township of Lakewood, seeks a reversal of the action of the Public Utility Commission in refusing to order the respondent, Lakewood Water Company, to extend its sewer facilities to the area in question unless certain conditions imposed by the utility relating to the financing of the extension are met.
The water company has an exclusive franchise for the construction, maintenance and operation of water and sewerage facilities in the Township of Lakewood.
A recently developed section of the township, called "Lakewood Village," comprises an area of three blocks and contains 58 low cost homes occupied largely by World War II veterans and their families. The water company furnishes water to these families but no sewer facilities. When the homes were *426 constructed during 1950 and 1951, dry wells and septic tanks for the disposal of sewage were installed by the developer with the consent of the municipality.
In a short time it was demonstrated that these septic tanks and dry wells are inadequate because the area is lowland with a high water table. Consequently, when heavy rains occur water gets into the cellars, the septic tanks and dry wells run over and the effluvium seeps back into the cellars and over the ground surface and creates a serious health hazard. The sanitation inspector of the township testified:
"Q. And you say it is getting worse?
A. That's right.
Q. What was your experience there during the recent heavy rains?
A. Well, most of the cellars had anywhere from six inches to a foot of water in them and they had to install sump pumps to try to keep the water out, but the main problem is, the cesspools are continually running over, and all these families are young people and they all have a lot of children and with summer coming on, they play out in the back yard and there is a cesspool right there and sooner or later it is going to create a terrific epidemic, and that is what we are trying to avoid.
Q. That is your one great fear, that an epidemic may occur?
A. That's right, it may occur at any time.
Q. What type of a community is Lakewood? What is its chief industry?
A. Lakewood is a health resort and it would certainly be very devastating to the Township as a whole to ever have a plague of any kind."
Study of the problem by the governing body of the municipality and by this inspector resulted in the conclusion that the only permanent remedy was to have respondent's sewer facilities extended into the location.
The sewer mains presently terminate one block away from "Lakewood Village." And when request was made for their extension, the company refused unless $21,094.28 of the cost thereof, which it asserted would be $24,230, was assumed in the first instance by the 58 home owners.
This assumption meant, according to the respondent's president, that the home owners would make a deposit of that amount with the company. Then, over a period of ten *427 years, the annual revenue from any new customers would be multiplied by 3 1/2, and that sum repaid pro rata to the 58 depositors. At the end of ten years any unpaid portion of the original deposit would not be returnable. There is no indication that the possible refund arrangement was made known to the village people before the hearing hereafter discussed but respondent says that it is the well established practice.
The division of the cost of installation of the sewer as set forth was arrived at by the use of a formula established by a general rule of the Utility Commission for application in cases involving water main extensions. No such rule has been promulgated for sewers.
In any event, the offer was refused and the present petition was filed requesting that the utility be ordered "to extend its existing sewerage facilities to `Lakewood Village' upon such terms and conditions as this Board may deem proper."
At the hearing it appeared that the proffered plan did not contemplate extending the mains from the present termination point one block away. According to respondent's president the absence of grade there and along the course of such an extension would necessitate the construction of a rather expensive pumping station. Therefore, the proposal was to begin the construction at a point two blocks farther away from the village area, then run the main (except for a very short distance at both ends) along a road known as Squankum Road for a distance of 1,420 feet, and then construct branches from this extension into and through the location in question.
Squankum Road is not part of the village development and, except for three or four homes, it is not built up. Thus the longer construction, although more expensive in cost of main, eliminates the pumping station and anticipates future home growth along that road.
The Legislature has spoken on the subject of extension of existing facilities of a utility. R.S. 48:2-27 provides:
*428 "The board [of Public Utility Commissioners] may, after hearing, upon notice, by order in writing, require any public utility to establish, construct, maintain and operate any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension."
After considering the evidence, the board found that two of the three conditions set out in the legislation had been met, namely, (1) the extension is reasonable and practicable, and (2) the financial condition of the company would reasonably warrant the original expenditure. But it concluded that the installation would not furnish sufficient business to justify its construction and maintenance at the company's expense. Consequently it declared that
"the terms and conditions under which the company has offered to provide the desired service are not unreasonable to the applicants for service in Lakewood Village, and that the record herein does not justify an order by this Board requiring the installation of the desired extension on more favorable terms to applicants for service."
The view adopted by the board was predicated upon two factors: (1) the evidence showed an operating loss on the sewer service for 1951 and 1952, and (2) the estimated annual receipts from the 58 home owners to be served immediately by the extension would be inadequate.
As to the first factor, it has already been noted that the utility has the exclusive franchise in Lakewood for both sewer and water facilities. It operates the two departments with common employees. Although the financial statement for 1952 and the president's testimony as to 1951 are to the effect that the sewer department operated at a loss in those years, it appeared that in 1952 the water department produced enough income to overcome the loss and to make possible the payment of a $7 dividend per share of the stock, which is 7% on the par value thereof. No proof was offered as to the 1951 dividend, but since respondent mentioned only the sewer department loss, the inference is inescapable that *429 the combined activities produced at least a fair return. Otherwise, such contrary fact would have been established. In fact, respondent did not prove at all that it is not receiving a fair and reasonable over-all return on its services. And it offered no proof that if it absorbed the cost of the proposed extension and received the estimated annual income therefrom, its total earnings would fall below the point of fair return.
The fact that a utility will not realize a profit or an immediate profit through a specific addition to or extension of its facilities, which serves the public necessity and convenience, is not dispositive of the matter. The criterion is the over-all return in an operation such as that of respondent. The holder of an exclusive franchise to supply important and essential public needs in a limited area cannot pick and choose its customers solely from the standpoint of pecuniary advantage and ignore those who may be said to constitute an integral part of the locality served, simply because, considered in isolation, their service will not produce a profit. The duty to the public imposed on the utility by its franchise is to serve such people. And under ordinary circumstances, a correlative duty exists on the part of the Utility Commission on proper application to see that a fair return results from the entire operation. People of State of New York ex rel. Woodhaven Gaslight Co. v. Public Service Commission, 269 U.S. 244, 46 S.Ct. 83, 70 L.Ed. 255 (1925); People of State of New York ex rel. New York & Queens Gas Co. v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337 (1917); Missouri Pacific Ry. Co. v. State of Kansas ex rel. Taylor, 216 U.S. 262, 30 S.Ct. 330, 54 L.Ed. 472 (1910); Atlantic Coast Line R.R. v. North Carolina Corporation Commission, 206 U.S. 1, 25, 26, 27 S.Ct. 585, 51 L.Ed. 933 (1907); Collingswood Sewerage Co. v. Borough of Collingswood, 91 N.J.L. 20, 28 (Sup. Ct. 1918), affirmed 92 N.J.L. 509 (E. & A. 1918); Annotation, 58 A.L.R. 540.
In the McCall case, supra, the United States Supreme Court said:
*430 "Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render. * * *" (245 U.S. 351, 38 S.Ct. 124.)
The board itself has quoted this language with approval. Atlantic City Sewerage Company, P.U.R. 1925 A. 135, 137 (1924).
The Supreme Court also said earlier in the quoted opinion:
"* * * There is no showing in the record as to the fair value of the entire property of the Gas Company used in the public service, nor of the rate of return which it was earning thereon, and therefore even if the return on the cost of complying with the order be conceded to be inadequate, this would not suffice to render the order legally unreasonable." (245 U.S. 350, 38 S.Ct. 124.)
A quite analogous situation appeared in Ridley v. Pennsylvania Public Utility Commission, 172 Pa. Super. 472, 94 A.2d 168, 171 (Super. Ct. 1953). There a water utility refused to extend its facilities into a section of a municipality. The Commission found that the need existed but dismissed the application because it was "not economically feasible or reasonable for the water company to provide the extension facilities and service and bear all of the cost." It appeared that the revenue from the extension would produce a .95% return on the investment and the Commission had suggested that the interested parties participate in the cost of construction.
In reversing the Commission's order, the court said:
"Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. City of Altoona v. Pa. P.U.C., 168 Pa. Super. 246, 77 A.2d 740. But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit. The action of the Commission must rest upon evidence which *431 shows that, without the contribution or loan of the consumers, the cost of construction would materially handicap the utility in securing a fair return on all its operations. * * *" (Emphasis ours.)
An element in the over-all return of the water company cannot be overlooked. It is conceded that the 58 home owners are users of the water service. Since the rates therefor are sufficient to overcome the asserted loss on the sewer operation, it follows that these persons by paying their water rates are assisting in the overcoming of the sewer deficit. Thus they are assisting in maintaining the sewer facilities for the present users and contributing to the company's over-all profit  without receiving any benefit therefrom. In the existing circumstances, this borders on discrimination.
Coming back to the statute, it will be observed that the one condition dealing with the cost of construction of an extension of facilities is that the financial condition of the public utility should be such as "reasonably warrants the original expenditure required" in making and operating it. The language, and particularly the words "original expenditure," indicate that the Legislature intended the cost of the extension to be borne by the utility if it had the financial capacity to do so. Where such capacity exists and the other two conditions imposed by the enactment are met, there would appear to be no reason for requiring the consumers to provide the capital investment. If the consumers are to be required to provide such funds, then  although the statute clearly makes it an important element  the financial condition of the utility in most cases would not be of much consequence. If, however, the financial condition would not reasonably warrant the expenditure, then it might be said generally that if the consumers provided the necessary funds, the utility would be lifted to the required status.
With respect to the second factor referred to, namely, the inadequacy of the estimated annual receipts, some further discussion is necessary. Respondent contends that "sufficient business" means that the new construction should show an immediate profit. The board seems to have adopted this view, although it did not say so expressly.
*432 On the subject of return through use of the proposed additional sewer lines, the evidence discloses that the estimated annual revenue from the 58 home owners would be $895.92. If the entire estimated cost of the installation, that is, $24,230, were assumed by the utility, the anticipated revenue would yield a gross return of 3.7%. Of itself, this would not be adequate. How much the percentage would be increased by development along Squankum Road and contiguous areas cannot be said, although it is reasonable to expect some additional revenue.
It is obvious at once that if the Legislature had intended profit to be a condition precedent to an order for expansion of facilities, the addition or substitution of a few words would have produced that result. So it may be assumed that the term "sufficient business" was deliberately and advisedly used in order to avoid making profit the criterion.
The cases and texts, to which allusion has already been made, demonstrate that immediate profit is not necessary. Some of the cases referred to consider that favorable future prospects establish justification for an order of extension. However, when the extension is reasonable and practicable and the public convenience and necessity will be served thereby, the basic consideration is neither immediate profit nor, in fact, any profit at all. The test is whether, as a result thereof, the over-all revenue from the utility's operations will no longer provide a fair and reasonable return. And if the evidence shows that the total revenue would fail to produce such return, then revision of the rates is the proper remedy unless it appears that the necessary increase will impose an unreasonable burden upon all of the consumers. Cf. People of State of New York ex rel., etc. v. Public Service Commission, supra, 269 U.S. 249, 46 S.Ct. 83; Collingswood Sewerage Co. v. Borough of Collingswood, supra, pp. 28, 29.
What then is the real significance of the term "sufficient business" in this statute? In the light of the established law, as applied to a situation like the present one, *433 it must signify that a sufficient number of users in a sufficiently integrated or localized group are desirous of service, and that the public convenience and necessity require that such users be served. Amount of return, present or prospective, may enter into the determination of whether such a group constitutes sufficient business but (the other conditions of the statute having been met) lack of profit or inadequacy of profit is important only as it affects the over-all return of the utility.
On the record before us we conclude that the group of 58 home owners represents sufficient business in the sense indicated.
We realize that the issue of the effect of the absorption of the cost of the extension upon the over-all return was neither explored to any extent by the parties nor determined by the board. Respondent's president said that the result would be to "reduce the low rate of return we are now experiencing," but the matter was not pursued further. Under the circumstances, justification does not exist for a direction by this court that the extension should be installed in accordance with appellant's application. Consequently, there must be a remand of the proceeding to the board for hearing and determination of this issue. If, upon such hearing, it appears that absorption of the cost of the extension by respondent will not reduce the over-all earnings below the level of a fair and reasonable return, the extension should be ordered. If, however, it appears that the effect would be to reduce the return below the stated level, then revision of the rates should be made to accommodate the extension, unless such revision would force an unreasonable burden upon all of the consumers. If there is a specific finding of such unreasonable burden, then the board should prescribe the reasonable terms upon which the making of the extension will be ordered.
The judgment is therefore reversed and the matter is remanded to the board for further proceedings in accordance herewith.