51 N.J. Super. 41 (1958)
143 A.2d 185
JOSEPH LANGAN, ET AL., PLAINTIFFS-APPELLANTS,
v.
WEST KEANSBURG WATER COMPANY AND THE BOROUGH OF UNION BEACH, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1958.
Decided July 1, 1958.
*42 Before Judges PRICE, HANEMAN and SCHETTINO.
*43 Mr. Ralph S. Heuser argued the cause for appellants (Messrs. Heuser, Heuser & DeMaio, attorneys).
Mr. Henry J. Saling argued the cause for respondent West Keansburg Water Company (Messrs. Roberts, Pillsbury & Carton, attorneys).
Mr. Joseph F. Mattice argued the cause for respondent Borough of Union Beach.
Mr. Howard T. Rosen, Deputy Attorney-General, argued the cause for Board of Public Utility Commissioners, etc. (Mr. David D. Furman, Attorney-General of New Jersey).
The opinion of the court was delivered by HANEMAN, J.A.D.
This is an appeal from a dismissal by the Board of Public Utility Commissioners of a complaint seeking (1) to determine which of the two defendants holds a franchise to serve water in a portion of Raritan Township, and (2) to compel an extension of water lines.
The facts are:
Joseph Langan (Langan) is a land developer who owns a section of Raritan Township (Raritan) known as Union Park. These lands are not presently serviced by either of the defendants. On February 14, 1927 the Borough of Union Beach (Union Beach) entered into a contract with Raritan, under the terms of which the former agreed to extend water mains and to supply water in a specifically described area within the latter municipality. On August 6, 1943 the agreement was renewed for a period of 15 years from the approval thereof by the Water Policy Commission. This extension of the agreement will expire on January 30, 1960. It is represented that Union Beach has no intention of renewing this contract upon its expiration, although it has taken no formal action to that end. On November 25, 1954 Raritan adopted an ordinance which granted a franchise to the West Keansburg Water Company (the Water Company) to serve water in the entire township, except "in roads, streets, avenues, beachways, parks, parkways and *44 highways and other public places in which there are now located water mains laid by the Water Department of * * * Union Beach for which permission has been heretofore duly granted by the Township Committee of * * * Raritan." The lands owned by the plaintiffs are not within the area described in the contract between Union Beach and Raritan, although Union Beach does have water mains adjacent thereto. The nearest existing main of the Water Company is located approximately one-half mile from Langan's tract. Desiring to develop this tract, Langan conducted negotiations with both Union Beach and the Water Company. Union Beach refused to furnish any water but the Water Company agreed to extend its mains provided Langan would pay to it the entire estimated cost of such extension. A controversy arose between Langan and the Water Company as to the latter's estimate of cost. Eventually Langan refused to absorb any portion of this cost. Langan and his wife, Marion H. Langan, thereupon filed a complaint in which he demanded "a determination be made as to the Water Company which holds a franchise for the area covered by the requested extension, and that that company be compelled to make the extensions on a proper and lawful basis." Thereafter a supplemental complaint was filed by 21 named plaintiffs, all allegedly owners of property, and residents of Union Park, in which they demanded identical relief.
It is to be noted that, although plaintiffs in the supplemental complaint state that they "desire that water lines be extended so as to make water available to their property on a proper and legal basis," none of them specifically and without reservation agrees to enter into a contract with the Water Company for water service. Of the 21 plaintiffs named in the supplemental complaint, Felix Kegley was the only one to appear personally at the hearing and he appeared only as a result of a subpoena which his own lawyer caused to be issued for him. His testimony concerned only a collateral matter. Despite the non-appearance of the other plaintiffs, we must assume that they continue to assert their contentions.
*45 The Water Company's answer demonstrates that it was "ready, anxious and willing to make an extension of its water mains according to the rules laid down by the State of New Jersey Public Utility Commission concerning extension of water service."
In recent years there has been considerable real estate development in Raritan and a resulting extension of the mains of the Water Company. In each instance the entire cost of the installation of the extension was paid for by the developer. The Water Company's total investment is equal to $426,138. Of that sum $368,771 represents payments made by developers for the cost of extension of water mains installed by the Water Company. This asset, of course, is not liquid, and represents subterranean water lines. The difference between these two sums reflects the investment of cash raised by the issuance of stock, debt securities, other borrowings and retained earnings. The annual report of the Water Company demonstrates that for the years 1955 and 1956 it had a net income of $349.85 and $297.15 respectively. No dividends were paid; neither were any salaries paid to the officers of the Water Company. The $368,771 above referred to is reflected on the books of the Water Company as a capital contribution rather than as income.
The Water Company estimates that the cost of extending its mains to the area in question would be $29,829. Langan estimates that the cost of such installation would be $22,329. The Water Company's estimate is the more realistic.
Plaintiffs argue that the Water Company is obliged to extend its mains to the vicinity of their properties. They stress that the so-called capital contributions should be treated as income and that, if so treated, would result in an adequate return to the Water Company in spite of the expenditure of $22,329 required for the presently sought extensions. In addition, they assert that a 2% annual depreciation charge on contributed capital, i.e., installation cost of mains paid by developers, is improper. In the alternative, *46 plaintiffs seek to force Union Beach to extend its mains and make water service available to them.
The pertinent statute is R.S. 48:2-27, which reads:
"The board may, after hearing, upon notice, by order in writing, require any public utility to establish, construct, maintain and operate any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension."
This statute was recently construed in Board of Fire Com'rs of Fire Dept. No. 3, Piscataway Tp. v. Elizabethtown Water Co., Consolidated (Elizabethtown Water Company, Consolidated v. Board of Public Utility Commissioners), 27 N.J. 192 (1958). The court there said:
"* * * a franchise holder who alone serves an important and essential public need in a limited area cannot pick and choose its customers solely on the basis of pecuniary advantage and refuse to supply those who constitute an integral part of the locality simply because, considered in isolation, their consumption of the product will not produce a profit." (Italics supplied.)
Here, as in the Elizabethtown case, supra, we have a utility which, although it is not suggested that it has a franchise exclusive in the law, yet is rendering the sole water service within the territorial limits of Raritan, except for that section now served by Union Beach. Union Beach does not have what is known in common parlance as a general franchise. It furnishes water in a limited area by virtue of a specific contract which, by its very terms, will expire in 1960. The Water Company holds the franchise for furnishing water in the section of Raritan with which we are here concerned. For the purpose of this opinion, therefore, we may disregard the water service of Union Beach and regard the Water Company as the lone purveyor of water.
In the Elizabethtown case, supra, and In re Tp. of Lakewod (Township of Lakewood v. Lakewood Water Co.), 29 N.J. Super. 422 (App. Div. 1954), the court established *47 the following criteria which are to be applied in determining the disposition of applications for extensions of facilities by a public utility of the type here under consideration: (1) whether public convenience and necessity require an extension of facilities; (2) whether such extension is reasonable and practical; (3) the effect of the return reasonably to be anticipated from the extension of facilities upon the overall return; (4) whether the financial condition of the public utility reasonably warrants the original expenditure for the extension.
It has been held that (the other conditions of the statute, i.e., above tests having been met), lack of profit or inadequacy of profit is important only as it affects the overall return of the utility. Elizabethtown Water Company, Consolidated v. Board of Public Utility Commissioners, supra; In re Tp. of Lakewood, supra.

I and II.
There is some doubt here whether public convenience and necessity require the extension, and whether the extension is reasonable and practical. Langan testified that he anticipated that eventual purchasers of homes from him to the number of 50 would require service from the Water Company. There is no certainty that, under zoning requirements, he will be permitted to replot his tract into more than 25 building lots. There is absent any proof which would lead to the certain conclusion that even one home will be constructed by him. He does not agree to execute any contract for water service. All of the 21 individual owners who have joined with him as parties plaintiff now obtain water from their private wells. None has testified as to the inadequacy of his present supply; neither has any agreed to use the Water Company facilities when available.
Langan argues that there are approximately 148 prospective users. He arrives at this figure by adding the following representative figures: the 21 individual plaintiffs, 15 potential customers along the line of the extension, 50 *48 prospective purchasers of homes which he hopes to construct, 62 persons now being served by Union Beach who will be available by 1960. The Water Company estimates a maximum of 36 customers.

III and IV.
As above noted, the Water Company's capital investment is $57,367. The cost of the extension, according to the Water Company, is $29,829. It is therefore seen that the cost, based on the Water Company's estimate, would be in excess of 50% of its present capital. There is no proof that further funds are available or could even be borrowed to finance the requested undertaking. The Water Company now has 1,272 customers. In order to accommodate plaintiffs, it would have to increase its investment by approximately 50%, which would result in only a 3% increase in its business (36 new customers). The present financial condition of the Water Company does not warrant an extension of mains at its expense.
An analysis of Langan's proof on these matters demonstrates that (1) the 21 individual plaintiffs have studiously avoided a definite commitment to contract for water service; (2) the lack of a definite construction program and the resulting lack of assurance that he will, in fact, construct any homes; (3) the lack of certainty as to what will happen in 1960  the termination date of the Union Beach contract (there is some implication that Union Beach will not seek to renew that contract in 1960, but there has been no official action to that end); (4) although the Water Company has had some negotiations with Union Beach concerning Union Beach mains in Raritan, the parties are stalemated. The Water Company's estimate of prospective customers seems far more realistic.
The average annual gross profit per customer under minimum rates, as reflected by the books of the Water Company, is $5.60, or a total from the 1,272 present customers of $6,360. The profit so calculated makes no allowance for *49 depreciation, taxes, or officers' salaries. The use of that gross figure as a basis for computing the anticipated additional gross revenue from new users results in the following: (1) If the Water Company's estimate of 36 new customers is used as a multiplier, the gross profit from new income would amount to $201.60 per annum; (2) if Langan's estimate of 148 new customers were used, the gross profit from new income would amount to $828.80.
The Water Company is presently paying interest on its debentures at the rate of 4% per annum. Assume, for present purposes, that Langan is correct in his estimate of $22,239 as the cost of the extensions; that the Water Company is capable of borrowing that sum and that it could negotiate such a loan at the same rate of interest it now pays on its debentures; the annual interest payments on such a borrowing ($889.56) would alone exceed Langan's optimistic estimate of revenue from new customers ($828.80). It we assume, in addition to the foregoing premises, that the new installation depreciates at the rate of 2% per annum of its original cost ($22,239) the Water Company would suffer a further loss of $444.78 on this investment.
The net income of the Water Company for 1956 was approximately 1/2 of 1%. The effect of the reasonably anticipated return from new customers on the overall return would reduce the net profit to a point where the utility would be operated at a loss.
But, argues Langan, the profit of the Water Company is actually greater than its books reflect, since it posts the $368,771 received from developers as the cost of laying mains as a capital contribution rather than as income, and charges a 2% annual depreciation on this amount against income. The bookkeeping as above set forth is apparently recognized utility practice. The utility is not permitted to consider such contributions as capital for the purpose of computing a reasonable return and so to establish rates.
The purpose of the depreciation is aptly expressed in Detroit Edison Co. v. Commissioner of Int. Rev., 319 U.S. 98, 63 S.Ct. 902, 903, 87 L.Ed. 1286, 1289 (1943):
*50 "It will be seen that the rule applicable to most business property of a cost basis properly adjusted leaves many problems of depreciation accounting to be answered by sound and fair tax administration. The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein. Or as a layman might put it, the machine in its lifetime must pay for itself before it can be said to pay anything to its owner. Experience and judgment hit upon usable mortality tables for classes of property from which annual rates of accrual are estimated and several different methods are employed for relating this physical deterioration and functional obsolescence to financial statements."
Langan cites the Detroit Edison Co. case, supra, as authority for his contention that the payments by developers should be regarded as income and that the 2% depreciation thereon is improper. That case concerned itself with whether the plaintiff had allowable deduction for income tax purposes for depreciation on extended facilities where the customer paid the cost of such extensions.
The question of whether such receipts were income or capital contributions was not before the court. The court, however, said (319 U.S. at page 103, 63 S.Ct. at page 904, 87 L.Ed. at page 1290):
"* * * The receipts have gone, so far as here involved, to add to the Company's surplus. They have not been taxed as income, presumably because it has been thought to be precluded by this Court's decisions in Edwards v. Cuba R. Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, holding that under the circumstances of that case a government subsidy to induce railroad construction was not income."
Thus, the implication from that dictum is a recognition of the propriety of considering the receipts as capital contribution even for income tax purposes. It does not follow, of course, that the cited case in any way militates against the conclusion that a utility such as the Water Company is not permitted to consider such contributions as capital for the purpose of establishing rates.
*51 In addition, such capital contributions appear in the liability side of the Water Company's balance sheet and are deducted from the capital investment in facilities for the purpose of arriving at the base upon which the utility is permitted to earn a return.
R.S. 48:2-18 reads:
"The board may, after hearing, upon notice, by order in writing, require every public utility to carry, whenever in the judgment of the board it may reasonably be required for the protection of stockholders, bondholders or creditors, a proper and adequate depreciation account in accordance with such rules, regulations and forms of account as the board may prescribe.
The board shall from time to time ascertain and determine, and by order in writing after hearing fix, proper and adequate rates of depreciation of the property of each public utility in accordance with such regulations or classifications. Such rates shall be sufficient to provide the amounts required, over and above the expense of maintenance, to keep the property in a state of efficiency corresponding to the progress of the industry.
Each public utility shall conform its depreciation accounts to the rate so ascertained, determined and fixed and shall set aside the moneys so provided for out of earnings and carry the same in a depreciation fund. The income from investments of moneys in the fund shall likewise be carried in such fund. This fund shall not be expended otherwise than for depreciation, improvements, new construction, extensions or additions to the property of the public utility."
The record discloses that the Water Company's 2% depreciation was made as a result of the direction of the Board of Public Utility Commissioners by virtue of R.S. 48:2-18. The Detroit Edison Co. case, supra, is not material, since it was concerned with the Internal Revenue Code. Under the New Jersey statute, the Water Company was not only permitted but was obliged to take the depreciation. Nothing has been proffered to demonstrate any fallacy in such a deduction, which is for the purpose of replacement of the mains at such times as they become obsolete.
It therefore appears that in a number of vital respects plaintiffs have failed to meet the basic tests.
The matter sub judice is distinguishable from the Elizabethtown case, supra, and In re Tp. of Lakewood, supra, in *52 several respects. In the former case the court found as a fact that (1) board of fire commissioners had applied for hydrant service and 36 home owners had agreed to use water if made available; (2) financial condition of the utility "reasonably warranted the original expenditure required"; (3) the failure to derive profit on the proposed extension would not result in a failure of a fair return within the entire franchised territory. In the latter case it found similar facts concerning sewer extension. All three of these elements are here missing.
In the matter sub judice we have an application primarily sponsored by a land developer. In the Elizabethtown case, supra, the court said:
"During the oral argument, the operation of the `General Rule Governing Extension Requested by Land Development Agencies' was also discussed. This rule calls for deposit by the developer of the entire cost of extending the main lines into the newly developed tract. That rule is not pertinent to the present inquiry. But in passing it must be recognized that ordinarily a builder who plans to construct a number of new residences on a tract of land occupies a different status from that of a group of home owners already living in a locality and their fire district who seek a water supply. Cf. Reid Development Corp. v. Parsippany-Troy Hills Tp., 31 N.J. Super. 459, 464 (App. Div. 1954)."
The effect of Langan's application, in the light of the facts, is to ask the Water Company to take a speculative stake in the success of his development of the area, without any reasonable assurance as to the amount of return it will receive for its investment or when, if ever, such a return will be realized. Cf. Reid Development Corp. v. Parsippany-Troy Hills Tp., 31 N.J. Super. 459, 464 (App. Div. 1954).
Plaintiffs have failed to demonstrate that the Water Company should, at its own expense, extend the mains.
Insofar as Union Beach is concerned, it is to be noted that the area here in question is beyond the territory within which it had contracted to furnish water until 1960. In addition, the Board of Public Utility Commissioners has no jurisdiction over a municipal water utility except where the municipality has, since 1929, acquired by purchase a *53 water company from a private source and where such company had theretofore been servicing more than one municipality. Such is not the present situation. There is no proof that Union Beach acquired a privately owned public utility serving more than one municipality. The Board of Public Utility Commissioners had no authority, in any event, to grant plaintiffs' request. Woodside Homes, Inc., v. Morristown, 26 N.J. 529 (1958); In re Borough of Glen Rock, 25 N.J. 241 (1957); Mongiello v. Borough of Hightstown, 17 N.J. 611 (1955).
Affirmed.