577 A.2d 829

VAN HOLTEN GROUP, KENNETH S. PIZZO, SR., EILEEN E. PIZ-
ZO, AND HUNTINGDON, INC., PETITIONERS–APPELLANTS,
v. ELIZABETHTOWN WATER COMPANY, RESPONDENT–RE-
SPONDENT.

Argued March 13, 1990—Decided August 7, 1990.

*Stewart M. Hutt* argued the cause for appellants (*Hutt & Berkow*, attorneys; *Stewart M. Hutt* and *Ben D. Shiriak*, on the briefs).

*Walter M. Braswell* argued the cause for respondent Elizabethtown Water Company.

*Helene S. Wallenstein*, Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*Robert J. del Tufo*, Attorney General of New Jersey, attorney, *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This case concerns whether the developer of a large residential community or a utility should bear the original costs of main extensions to a new development. The developer deposited with the utility funds to cover the original expenditure for main extensions, and now seeks full repayment of the deposit. The utility claims that the developer is entitled only to a partial refund calibrated to the completion and occupation of individual units within the development. The case requires the Court to construe and apply a governing statute as well as to review the application of a regulation promulgated under that statute. The answer to the question here centers on whether the pro-

posed development represents sufficient business to require the utility to bear the original costs of the extensions.

The Appellate Division affirmed decisions by the Board of Public Utilities (Board) that required developers to bear the initial costs of the extensions and ordered a partial deposit refund linked to completion and occupation of individual units. We subsequently granted the developer's petition for certification. 117 *N.J.* 66, 563 *A.*2d 830 (1989).

## I.

In order to facilitate the construction of a new residential development, petitioner-appellants Van Holten Group (Van Holten) entered into water-main-extension loan agreements with respondent Elizabethtown Water Company (Elizabethtown). Van Holten is a group of three land developers. The development project involved the construction of residential units in Somerset and Mercer Counties. The main-extension agreements at the center of this dispute concerned 640 of those units. Under the agreements, Elizabethtown agreed to begin construction of the off-site and on-site main extensions necessary to serve the new units, and Van Holten agreed to deposit $1.028 million to cover the cost of the extensions. A "main extension" is any addition to an existing main. An "on-site" extension is one constructed on a tract under development, and an "off-site" extension is built on an existing public street. Only one of the extensions in this case is off-site. Van Holten made the deposit "under protest," thereby permitting construction to begin while preserving the right to seek administrative relief. Elizabethtown agreed to refund part of the deposit to Van Holten after each completed new unit was occupied by an owner and was connected to the water system. The maximum amount of the possible refund under the agreements was approximately $205,-400. The parties disagree about the formula used to determine the total amount of the refund under the agreements, but the

result was roughly two times the estimated annual revenue from connected customers.

In March and April 1984, Van Holten filed five petitions with the Board against Elizabethtown contesting the validity of the loan agreements. Van Holten argued that under *N.J.S.A.* 48:2–27, the utility must refund all of the deposit on completion of the entire project. In the alternative, Van Holten requested that if Elizabethtown were not ordered to pay all construction costs, the Board establish a more reasonable refund formula than that contained in the agreements. *N.J.S.A.* 42:2–27 provides:

> The [Board of Public Utilities] may, after hearing, upon notice, by order in writing, require any public utility to establish, construct, maintain and operate any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension.

Pursuant to *N.J.S.A.* 52:14F–1 to –11, the Board referred the petitions to the Office of Administrative Law as a contested case. At hearings before an Administrative Law Judge (ALJ), the parties presented conflicting evidence regarding whether the extensions would provide "sufficient business" for Elizabethtown and whether the financial condition of the utility reasonably warranted the original expenditure.

Van Holten's expert witness, a certified public accountant, testified that if the entire cost of the main extension deposits were refunded to Van Holten, the utility's overall rate of return would be reduced only from 8.95% to 8.93%, a .02% reduction. He estimated that to maintain an 8.95% rate of return, Elizabethtown need only increase its annual rate by sixty-five cents per customer. He concluded that except for a possible cash shortfall, a full refund would have "no material effect" on Elizabethtown's financial condition.

Elizabethtown's sole witness was its controller, also a certified public accountant. She testified that the statutory requirements of *N.J.S.A.* 48:2–27 had not been satisfied. She stated

that the Van Holten projects would not generate "sufficient business" to justify building the main extensions, and that the utility's financial position did not warrant installation of the extensions at its own expense. She maintained that the cost of a backup plant to service the new units is an expense that must be considered when determining Elizabethtown's profitability. After adding in that cost, she determined that Elizabethtown would lose approximately $135,000 if Van Holten were to receive a full refund. In her opinion, rate-payers would each have to pay an extra $1.88 per year if a full refund were made, assuming the utility sought to maintain its current rate of return. A full refund was feasible, she said, only if the amount of new business immediately generated would support payment of the refund.

Elizabethtown's expert also calculated an increase in the rate base needed to serve new customers, reflecting the costs of a backup plant and including the cost of new meters. If Van Holten received a full refund, Elizabethtown's investment cost would increase, which, according to her, would result in a decrease in the rate of return on the rate base from 11.31% to 11.22%.

The ALJ concluded that Van Holten's evidence was more "pertinent" than that provided by Elizabethtown and should be adopted. The Van Holten expert's figures ":reveal[ed] beyond a doubt that requiring [Elizabethtown] to bear the costs of the main extension will not reduce its overall earnings below a tolerable level pending any rate increase."

The ALJ had little difficulty finding that the proposed on-site extensions were "reasonable and practicable," given Van Holten's undisputed testimony regarding the "hot" real-estate market in that area. Noting that although "at the time of construction all future business theoretically is speculative," he also concluded that "there exists little question that the main extensions *ultimately* will furnish sufficient business to the .Company...."

He then analyzed the third requirement of *N.J.S.A.* 48:2–27, *i.e.,* whether "the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension." He concluded:

(1) [A] utility is obligated to extend its main to serve the needs of its franchise area regardless of whether a profit immediately will be obtained since the basic inquiry is the effect on the overall rate of return of the utility stemming from the burden of the expenditure, if any; and

(2) [A]bsent an adequate showing by the utility of a legitimate adverse impact on its overall rate of return, it is an obligation of that utility, not to the consumer, to construct its system.

Consequently, because Van Holten had satisfied the requirements of *N.J.S.A.* 48:2–27, he held that Elizabethtown should bear the original cost of the on-site main extensions. He therefore ordered a full refund to Van Holten for the cost of the on-site extensions.

The ALJ rejected Van Holten's request for a pro-rata reimbursement for the off-site main extension. Van Holten had sought a refund of its deposit for the off-site extension if and when other developers connected to it. The ALJ found that the off-site extension was not a "system-wide" improvement that would permit pro-rata reimbursement: "[T]he eventual construction of homes and the hookup of customers by persons not known to the company at this time results in much too amorphous a situation to require the company to bear the cost."

Both parties appealed the ALJ decision to the Board. Elizabethtown sought to avoid the costs for the on-site extension, and Van Holten sought to obtain a refund for the off-site extension. The Board "reluctantly" adopted the ALJ's decision by a vote of two to one. It ruled that the requirements of *N.J.S.A.* 48:2–27 had been met, and thus the Board could not exercise its discretionary authority to determine the cost allocation based on equity principles.

The dissenting commissioner believed that the extensions were not "reasonable to the degree that ratepayers should absorb any costs for construction." In addition, he stated that the area served by the extension is sparsely populated and that

"the anticipated growth rate may not be of such a nature that this extension will be utilized to its full capacity." Thus, in the dissenter's view, the record lacked evidence sufficient to support a finding that the main extension would generate "sufficient business" for Elizabethtown.

On reconsideration, the Board, by a vote of two to one, affirmed its prior order insofar as it denied a refund for the off-site main extension, and reversed its earlier finding that a full refund for the on-site extensions was necessary. The second Board decision focused exclusively on the "sufficient business" requirement of *N.J.S.A.* 48:2–27. It rejected the ALJ's "implicit conclusion" that the statute "encompasses future and speculative 'sufficient business,' as distinguished from present and existing 'sufficient business.'" Because no homes had been built in the areas to be served by the extensions when the parties had executed the loan agreement, "there was not then existing 'sufficient business' to have warranted the original expenditure by Elizabethtown in making the extensions." The Board also attacked the ALJ's finding that the "hot market" will *ultimately* furnish "sufficient business" in the context of *N.J.S.A.* 48:2–27.

The Board noted further that an eight-year payback period, estimated by Van Holten, was "of such duration that it would not constitute 'sufficient business'" under the statute. The Board concluded:

[A]lthough the main extensions to petitioners' developments may in the future furnish "sufficient business" within the meaning of *N.J.S.A.* 48:2–27 to warrant the construction and maintenance of the same at Elizabethtown's own cost and expense, such "sufficient business" does not presently exist and therefore Elizabethtown properly required [Van Holten] to deposit with it the estimated cost of such extensions.

The dissenting commissioner believed that "the Elizabethtown Water Company will derive sufficient business from this main extension to justify the Board's original decision."

Because the parties had failed to negotiate a settlement regarding the amount of the on-site refund, the Board's unani-

mous final decision ordered Elizabethtown to reimburse Van Holten according to the suggested refund formula in *N.J.A.C.* 14:3–8.2(c). Under that regulation, Van Holten would be repaid for the on-site extensions at a rate of two-and-one-half times the estimated annual revenue for each unit completed and occupied. The Board did not disturb that part of its initial decision denying Van Holten a refund for the off-site extension.

The Appellate Division affirmed the final Board decisions. The court found that sufficient credible evidence in the record as well as the Board's technical expertise supported the Board's determination concerning the on-site extensions. The court also found no authority to support Van Holten's demand for pro-rata reimbursement for the off-site extension, and agreed with the ALJ that the off-site extension was not a system-wide improvement that would require such reimbursement.

II.

This Court reviewed the application of *N.J.S.A.* 48:2–27 in *In re Board of Fire Commissioners of Fire District No. 3, Township of Piscataway*, 27 *N.J.* 192, 142 *A.*2d 85 (1958). The Board of Public Utility Commissioners (PUC) had ordered Elizabethtown Water Company to extend mains to supply water to a fire district within the Township of Piscataway. The water company already provided service to the area completely surrounding the district in question, and its existing mains lay outside the district by two blocks. *Id.* at 197–98, 142 *A.*2d 85. The fire district itself had no water supply, but the water company had refused to extend its mains unless the district financed the original costs. The district needing service covered fifty-one acres and contained sixty constructed and occupied homes with room for further development. Also, the dispute had arisen during a period of growth for the district. The Court affirmed the Board's order.

Although the hearing before the PUC had established that the company would suffer an annual loss of approximately

$1,400.00 on the operating costs of the extension, it had also established that that loss could be absorbed in the company's overall revenue "without any appreciable effect upon the [current] reasonable return," and that the cost of the extension was only a small portion of its capital outlay for improvements for that year. The utility conceded that the cost of the extensions "could have no material effect on its financial condition." *Id.* at 199, 142 *A.*2d 85. The Court rejected the argument that profit was dispositive of whether the utility should bear the original expenditure, pointing instead to "overall return" as the proper criterion. The Court based that view on the duty of public utilities to provide essential services to entire localities, not to just those portions of them that return profits. *Id.* at 201, 142 *A.*2d 85. The Court also concluded that the Legislature had not intended that profit determine whether a utility should bear the cost of extending its facilities. *Id.* at 202–03, 142 *A.*2d 85. The Court then defined "sufficient business" under the statute:

[I]t must signify that a reasonable number of prospective users in a reasonably integrated or localized group within the franchise area and within reasonable distance of existing facilities are desirous of service, and that the public convenience and necessity require that such users be served. [*Id.* at 203, 42 *A.*2d 85.]

The Court held that the evidence satisfied the "sufficient business" requirement of *N.J.S.A.* 48:2–27 and that therefore the utility should bear the original expense of the extensions. *Ibid.*

The holding and reasoning of *Piscataway* closely followed an Appellate Division decision, *In re Township of Lakewood,* 29 *N.J.Super.* 422, 102 *A.*2d 671, *reh'g den.,* 30 *N.J.Super.* 79, 103 *A.*2d 387 (1954). In that case, the Appellate Division had reversed the PUC's refusal to order the Lakewood Water Company to bear the cost of extending its sewer facilities to a development in Lakewood Township. The development consisted of fifty-eight new but occupied homes in a three-block area. The water company supplied water but no sewer service to the homes. Shortly after the homes had been built and occupied, the development's septic tanks and dry wells proved to create a

serious health hazard. The municipality had then asked the water company to extend to the development its sewer mains, located one block from the area. The company had refused to do so unless the homeowners deposited a substantial portion of the cost, to be refunded annually, over a ten-year period, according to a specific formula. The municipality had then filed a petition with the PUC to compel the water company to extend its sewer mains to the development. *Id.* at 425–27, 102 *A.*2d 671.

The hearing established that for engineering purposes, the sewer extensions to the development would have to begin three blocks away. The extension would run along an undeveloped road, not part of the development, for which future development was "anticipated." The Commission had found that the proposed extension was reasonable and practicable and that the water company's financial condition reasonably warranted the original expenditure, but that the extension would not provide sufficient business to require the utility to bear the original expense. *Id.* at 428, 102 *A.*2d 671.

The Appellate Division stated that whether a utility realized a profit through an extension of its facilities did not resolve the question of "sufficient business" under the statute. Rather, it declared that "[t]he criterion is the over-all return in an operation such as that of respondent." *Id.* at 429, 102 *A.*2d 671. The court reasoned that public utilities could not "pick and choose" their customers within exclusive franchise areas based on profit. *Ibid.* The court further concluded that the Legislature had purposefully avoided making profit a criterion in the statute. "It is obvious at once that if the Legislature had intended profit to be a condition precedent to an order for expansion of facilities, the addition or substitution of a few words would have produced that result." *Id.* at 432, 102 *A.*2d 671. Applying a test similar to that later used by this Court in *Piscataway*, the Appellate Division concluded that on the facts of the case "the group of 58 homes owners represents sufficient business." *Id.* at 433, 102 *A.*2d 671.

Van Holten draws a distinction between whether it should receive a full refund of its deposit and whether it should provide the original expenditure for the extensions. It claims the issue in this case is whether it should receive a full refund, not whether it should have borne the original costs. It states, in its petition for certification, "The Van Holten Group ... has always agreed with the Board that developers should initially bear the cost, and has never argued the contrary. Thus, the Board decided a *non-issue.*" Van Holten further asserts that the Board's determination regarding sufficient business was "irrelevant," and it concedes that Elizabethtown "was entitled to a deposit ... to eliminate any risk on its part." That argument is an attempted sleight of hand, however, for the issue of the full refund is the issue of who should bear the original costs. We must assume that Van Holten does not genuinely believe it should, as it says, initially bear the cost. If that is true—and that is the question before us—there is no statutory or regulatory basis for a full refund. Van Holten, in fact, as noted, made the deposit "under protest." It has also, in fact, contended at every stage of this case that the utility should bear the original costs of the extensions. It claims specifically that under *Piscataway* and *Lakewood,* its development provided sufficient business at the time of the agreements to justify requiring Elizabethtown to bear the original costs.

Van Holten relies on *Piscataway* and *Lakewood* in arguing that it is entitled to a full refund for the on-site extensions. It stresses that those cases identified the overall rate of return that would result from the extensions as dispositive of whether the "sufficient business" requirement of the statute is satisfied, and points to the evidence it presented at the administrative hearing and relied on by the ALJ suggesting that a full refund would decrease Elizabethtown's overall rate of return "a mere 0.02% (from 8.95 to 8.93%)." Thus, Van Holten contends, the consequence of a full refund would be that the utility's "overall return is only marginally affected," and a full refund is required.

We agree that the *Piscataway* test of "sufficient business" under *N.J.S.A.* 48:2–27 applies here, and we note that neither party has argued at any stage of the case that profit is or should be the criterion for "sufficient business" under the statute. The flaw in Van Holten's argument, however, is that it overlooks critical factual distinctions between the *Piscataway* and *Lakewood* cases and the present dispute. Those critical distinctions concern the existence of customers requesting the extensions and prepared to use the service. In *Piscataway*, the fifty-one-acre district to which the facilities were to be extended had contained sixty occupied homes. Nearly two-thirds of those homes and the local fire department had indicated that they would use the water company's facilities as soon as they became available. In *Lakewood*, the three-block area to be serviced had been completely developed—fifty-eight occupied homes were already being supplied with water by the utility and were seeking the sewer extensions. In both those cases, at the time of the original expenditure, the districts had been substantially developed and occupied, and there had been dependent customers ready and willing to use the extensions. Here, in contrast, at the time of the original expenditures, the area to be serviced was undeveloped, and there were neither homeowners nor other customers who had indicated a desire for the extensions.

The Board recognized those critical facts in its second decision, in which it ruled that under *Piscataway*, the record did not indicate that the extension would provide sufficient business such that Elizabethtown should bear the costs for the on-site extensions.

> In both *Piscataway* and *Township of Lakewood*, unlike the situations in the petitions before us, the then present reality in each case was that "prospective users" were existing, ready, desirous of and able to use the services provided by the extensions, and thereby furnish the "sufficient business" justifying the extensions at the utilities' own expense. This, in our view, is the meaning of the phrase "prospective users ... are desirous of service."
>
> In the petition before us, according to the testimony of Elizabethtown's controller, at the time of the execution of the agreements, no homes had been built in the areas to be served by the extensions. Accordingly, there was not

then existing "sufficient business" to have warranted the original expenditure by Elizabethtown in making the extensions.

The Board properly rejected the ALJ's finding that the statutory requirement of "sufficient business" was satisfied because the "main extensions *ultimately* will furnish sufficient business." The Board explained:

> Notwithstanding the "hot market", whether the extensions before us *ultimately will* furnish "sufficient business" in the context of the *N.J.S.A.* 48:2–27 standard was and is still somewhat speculative and subject to the occurrence of unanticipated events, a risk, we believe, which should properly be borne by the developers, not by Elizabethtown and its ratepayers. ·

> At the point in time when the extension agreements were executed by petitioners under protest there was not sufficient business existing to warrant Elizabethtown extending its mains to petitioners' developments at Elizabethtown's own expense. At that time the developments to be serviced by the main extensions were proposed: they had not been completed or, indeed, even substantially completed. The lands were vacant. That being the case, at the time there was a risk that if Elizabethtown extended its mains it might ultimately find that after doing so, there would not then or within a reasonable period of time be sufficient business to have warranted the extensions. The developments might not have been commenced or, if commenced, completed or sufficiently completed so as to generate sufficient business. The risk of such eventuality should not be cast upon Elizabethtown and its existing ratepayers.

> Unanticipated events such as bankruptcy, material shortage, natural or man-made disasters or a precipitous rise in interest rates adversely affecting the developers and/or their potential customers, might intervene to prevent commencement or completion of the developments, despite the best intentions and efforts of the developers, with the result that Elizabethtown might not gain the sufficient business contemplated by *N.J.S.A.* 48:2–27 to have warranted its construction of the extensions at its own expense. It was therefore proper for Elizabethtown to have required deposits from petitioners to cover the estimated costs of the extensions.

We agree that the "sufficient business" requirement under the statute is not satisfied by a showing that the area requesting extension of facilities is a "hot market." The statute requires that "a reasonable number of prospective users in a reasonably integrated or localized group ... within reasonable distance of existing facilities are desirous of service." *Piscataway, supra,* 27 *N.J.* at 203, 142 *A.*2d 85. Speculation regarding how many customers may exist at some point in the future is insufficient to satisfy that test. The policy underlying the statute is that the utility and its customers outside the area

to be serviced should not have to assume the risks of extending facilities to areas that cannot clearly, by themselves, justify and sustain the expenditure. As we decided in *Piscataway*, the statute does not require that the utility immediately realize a profit or be certain of the sufficiency of the new business before it must bear the costs of extensions. Nevertheless, the statute requires more than speculation concerning the business that calls for the extensions.

In *Piscataway*, the Court listed the potential for new customers among the factors that supported a finding of sufficient business such that the utility had to bear the costs of the extensions. 27 *N.J.* at 203, 142 *A.*2d 85. That factor, however, must be considered in the context of other factors in each case; alone, it cannot support a finding of "sufficient business" under the statute. In *Piscataway*, the district seeking service was small, fairly developed and occupied, and surrounded by developed areas connected to the utility. As the Court noted, "it is only reasonable to suppose that others will take advantage of [the projected mains]." *Ibid.* Here, on the other hand, although there is surely a large potential for new customers, there are not other factors that make it reasonable to assume that new customers will necessarily take advantage of the projected service.

A comparatively recent Appellate Division case, *In re Hilton New Jersey Corporation*, 205 *N.J.Super.* 217, 500 *A.*2d 728 (1985), also bears on the present dispute. In *Hilton*, two new Atlantic City casino hotels appealed a Board of Public Utilities order requiring them to finance the extension of electricity lines to their projects. The electric company's rate-base-stabilization policy "shifted the total cost of a line extension from [the company] to large general service customers served by the extension." *Id.* at 220, 500 *A.*2d 728. In the Appellate Division's view, the issue on appeal was not the merits of the rate-base-stabilization policy but whether the casinos, which were large general-service customers, provided "sufficient business" to require, under *N.J.S.A.* 48:2–27, the electric company

to bear the original costs of the extensions. The court stated the question as "what net revenues were to be reasonably anticipated from the line extension and what the effect of a capital expenditure of $3,200,000 would be on [the utility's] rate of return in the light of such reasonably anticipated net revenues." *Id.* at 223–24, 500 *A.*2d 728. The court reversed the Board's decision and remanded to the Board to "apply *N.J.S.A.* 48:2–27 in favor of [the casinos] if it reaches a fact finding that the cost of the line extension would be recovered out of revenues generated from [the casinos] within what [the Board] determines to be a reasonable period of time." *Id.* at 224, 500 *A.*2d 728.

*Hilton* does not conflict with *Piscataway* and *Lakewood.* The difference between *Hilton* and those earlier cases is that *Hilton* involved two "large general service" customers. *Id.* at 220, 500 *A.*2d 728. It was not a matter of speculation whether the casino projects would connect to the utility service. Both projects left no question that "revenues from new services to [the casinos] would be adequate within a relatively short period of time to repay [the electric company's] capital expenditure, without adverse effect on its overall rate of return or the rate of return from the large general service customer class." *Id.* at 222, 500 *A.*2d 728. Such certainty is absent in the present case, where the project consists of small, individual, and, at the time of the expenditures, purely speculative customers. Furthermore, unlike in *Hilton,* customers who would connect to the extensions in the present case would not do so at the same time but only sequentially, over an indeterminate period of time.

*N.J.S.A.* 48:2–27 does not distinguish between on-site and off-site extensions. We agree with the ALJ, the Board, and the Appellate Division that the off-site extension in this case does not provide sufficient business to require Elizabethtown to make the original expenditure for its construction. At the time of the agreements between Van Holten and Elizabethtown, there were no developers committed to connecting to the off-site extension. It was purely speculative whether any other

developers would connect to the off-site extension in the future, and, if any were to connect, there is no certainty concerning how much business any such further development would generate. The record simply provides no justification for requiring Elizabethtown to pay the original costs of the off-site extension.

Under the circumstances, it is clear that Elizabethtown should not bear the original cost of the extensions. Indeed, our judgment is consistent with the current regulatory structure in this area. *N.J.A.C.* 14:3–8.2(a) provides:

> Except as otherwise provided, where applications for extensions into newly developed tracts of land are made by individuals, partnerships or corporations, interested in the development or sale of land, but not as ultimate residents, the utility may require a deposit from the applicant covering the estimated cost of the extension ... necessary to serve the tract.

The deposit by Van Holten, albeit under protest, conforms to that regulation and in some measure confirms the soundness of our determination.

### III.

There remains the question of how much of Van Holten's deposit should be refunded. On this issue, we are troubled by the substantial disparity between the amount of Van Holten's deposit, $804,367, and the maximum refund of approximately $312,560 authorized by the Board's third decision.

The amount of $804,367 represents the initial deposit by Van Holten of $1.028 million reduced to reflect the actual cost of construction ($976,732), and further reduced to reflect the cost of the off-site main ($172,365). The maximum refund authorized by the Board's third decision is based on a formula, pursuant to *N.J.A.C.* 14:3–8.2(c), of two-and-one-half times the estimated annual revenues from each completed and occupied unit employing the new water service over a ten-year period. The Board's third decision, consistent with *N.J.A.C.* 14:3–8.2(c), ordered that the refund be increased if actual revenues during the ten years following the date of the deposit exceed estimated revenues.

In its second decision, in determining that at the time of the agreements there was not "sufficient business" to require Elizabethtown to bear the original costs of the extensions, the Board noted that the developer should bear the risk of the extensions "until such time as 'sufficient business' has become a reality." The Board ordered that

the monies deposited by Petitioners with Elizabethtown, less the cost of the off-site extension, be returned to Petitioners over a period of time not to exceed 10 years, pursuant to a repayment schedule to be worked out between counsel and filed with the Board within 45 days of the date of this Decision and Order Upon Reconsideration, said repayment schedule to be so devised that the cash flow of Elizabethtown will not be unduly impaired; and, by way of clarification and supplement of the intent and meaning of the foregoing language of this Paragraph 3, which language was part of the Board's oral Decision and Order in this matter on April 23, 1987, the Board states that it is and was the intention of the Board to permit counsel freedom to negotiate an agreement in respect to the amount of the deposit to be refunded and a schedule of payments of the same within the stated ten year cap, and for counsel to submit said agreement to the Board for its review and approval, and that, failing such agreement, for counsel to submit their individual proposals in respect thereto to the Board for consideration. In the latter event, the Board may accept and enforce either proposal or in the alternate direct that a plan devised by the Board shall be binding upon the parties.

Thus, the Board's second decision could be fairly characterized as an administrative interpretation of *N.J.S.A.* 48:2–27 that would permit but not require the cost of an extension of a public utility's facilities to be borne initially by a developer, but ultimately by the utility, in the event that the extension generates "sufficient business." In our view, that administrative application of *N.J.S.A.* 48:2–27 comports with the legislative intent underlying the statute, and constitutes an authorized exercise of agency discretion.

Following the second decision, the parties failed to reach an agreement on the amount or terms of the refund. Each submitted its own proposal to the Board. As the Board noted in its final decision, Elizabethtown proposed

that it refund $530 for each single-family dwelling and $350 for each townhouse (compared to $300 and $400 per single-family dwelling and $280 per townhouse, per its main extension agreements), such refunds to be made during a ten-year period as each dwelling is sold and metered. These upwardly revised refund

amounts were based upon an evaluation of the average water use per customer at three sample developments in growth towns. This proposal utilized the Board's suggested 2½ [sic] refund formula for main extensions set forth at *N.J.A.C.* 14:3–82.(c). The proposal effectively raised Respondent's total potential refund from $205,420 to $312,560 or, in terms of percentage of total deposits refunded, from 26% to 40%.

The Board noted further that Van Holten "submitted a proposed repayment schedule which provide[d] for the full refund of all the main extension deposits and that the refunds be made at the time of the hook-ups, over a five year period."

In the final decision, the Board made reference to its 1985 amendment to *N.J.A.C.* 14:3–8, which revised the formula for refunds of water-main-extension deposits from five to two-and-one-half times estimated annual revenue, observing that the revised formula constituted "an equitable allocation of costs among a utility, its prospective customers and its current ratepayers." The Board then ordered that the refund to Van Holten be calculated on the basis of *N.J.A.C.* 14:3–8.2(c), which essentially requires the utility to refund an amount equal to two-and-one-half times estimated annual revenue for premises abutting the main extension and from the municipality for fire protection service. The amount of the refund payable to Van Holten pursuant to the regulation is estimated to be $312,560, which is $491,807 less than the amount of the deposit.

We are unable to discern from the record or from the Board's final decision any justification for the discrepancy between the amounts of the refunds contemplated by the Board's second and third decisions. The second decision, as noted, contemplated a full refund in the event of sufficient business generated in the future, but the third decision precludes a full refund even in the event of sufficient business generated in the future. Unquestionably, the Board was entitled to broad discretion in choosing the appropriate refund formula. That discretion, however, is not unbridled and must be exercised in a manner that will facilitate judicial review. An agency acts in an arbitrary or unreasonable manner if the record lacks "substantial evidence ... to support the findings upon which the agency based

application of legislative policies." *Public Serv. Elec. & Gas Co. v. Department of Envtl. Protection*, 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985). Administrative agencies must "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Crema v. Department of Envtl. Protection*, 94 *N.J.* 286, 301, 463 *A.*2d 910 (1983) (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 *F.*2d 584, 598 (D.C.Cir.1971)).

Accordingly, we remand the matter to the Board for the development of a supplemental record addressing the question whether all or less than all of the deposit should be refunded to Van Holten. We are confident that either after submission of supplementary proofs on this issue or additional fact-findings based on the current record, the Board will be in a position to determine the appropriate refund payable based on sufficient evidence and adequate reasons.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter remanded to the Board of Public Utilities for further proceedings consistent with this opinion. We do not retain jurisdiction.