**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2308-21

IN THE MATTER OF NICOLE-
KIRSTIE, LLC,

    Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION,

    Respondent-Respondent.

_____

Argued February 27, 2024 — Remanded July 18, 2024
Reargued October 30, 2025 — Decided January 20, 2026

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the New Jersey Department of Environmental Protection.

Daniel C. Epstein argued the cause for appellant (Flaster/Greenberg, PC, attorneys; Marty M. Judge and Daniel C. Epstein, on the brief).

Samuel R. Simon, Deputy Attorney General, argued the cause for respondent.[1]

PER CURIAM

This appeal, which returns to us for the third time, requires us primarily to resolve Nicole-Kirstie, LLC's, request that we reverse the New Jersey Department of Environmental Protection's (DEP) decision regarding the scope of its environmental investigation and remediation responsibilities at the former Dorchester Shipyard, an industrial site located along the Maurice River in Dorchester Township (the Site), and, specifically, if Nicole-Kirstie must comply with DEP's requirement to conduct additional sediment sampling in order to investigate and remediate any contamination that may have migrated into the Maurice River from the Site. To resolve that issue, we must address the preclusive effect of a 2006 probate court's judgment filed after Nicole-Kirstie bought the contaminated property in 2005 and what impact that 2006 order has on a 2019 Administrative Consent Order (ACO) that Nicole-Kirstie voluntarily entered, in which it agreed to conduct further investigation and remediation of any discharged hazardous substance that migrated from the Site into the Maurice River. After a thorough and conscientious review of the record in the context

---

[1] Counsel has not filed a new brief, but relies on the previously filed brief.

A-2308-21

of the applicable standard of review and substantive legal principles, we reject all of Nicole-Kirstie's arguments on this issue.

With respect to the parties' other arguments, we first reject DEP's contention that we should dismiss the appeal as untimely. We are also satisfied DEP complied with our remand instructions and find no merit to Nicole-Kirstie's arguments to the contrary.

As noted, we reject, however, Nicole-Kirstie's primary argument that DEP's current enforcement actions are precluded by a 2006 order entered in a probate matter involving the prior owner of the Site. We reach this conclusion because we are convinced that the preclusive doctrines it relies upon do not, under the circumstances, absolve it of its cleanup responsibilities based on any events, agreements, or understandings by a previous owner or assignee representing creditors to the previous owner's estate, or orders in a 2006 probate court final accounting judgment that did not name Nicole-Kirstie, expressly or impliedly apply to future owners, and, most importantly, did not discuss the scope of contamination, investigation or remediation.

Our decision is substantially informed by the undeniable fact, never sufficiently explained by Nicole-Kristie, that for over a decade it acted entirely inconsistent with its present claims that the 2006 probate order unequivocally addressed and resolved it of any responsibility to investigate and remediate

A-2308-21

issues related to the Maurice River. That inconsistent conduct culminated with its informed decision to voluntarily sign the ACO in 2019 pursuant to DEP's direct oversight of the Site, in which it never referenced the 2006 order and explicitly agreed: (1) "to remediate, pursuant to this [ACO], all hazardous substances, hazardous wastes, and pollutants discharged at the Site"; (2) it was required to conduct "a remedial investigation of the Contaminated Site," which refers to "[t]he Site and all other areas to which any hazardous substance discharged on the Site has migrated"; (3) it "shall remediate the Contaminated Site, including all discharges at the Site discovered during the remediation as [DEP] directs"; and (4) it waived its right to request an administrative hearing concerning the terms of this [ACO] " and "agrees not to contest . . . the terms or conditions hereof, except . . . in an [enforcement] action or proceeding brought by [DEP]."

I.

For convenience to the reader, we restate the relevant facts underlying the parties' dispute as set forth in our prior opinion, supplemented by those additional facts from the record and the subsequent procedural history. In re Nicole-Kirstie LLC v. N.J. Dep't of Env't Prot., No. A-2308-21 (App. Div. July 18, 2024). We recite the facts in greater granularity than typical because we

consider them necessary for an informed understanding of the issues raised by the parties.

Dorchester Industries, Inc. (Dorchester), owned and operated a ship building facility at the Site at which it ceased operations in June 1998, triggering "notification and remediation requirements" under the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -14 (ISRA).[2] One month later, Frank Wheaton, Dorchester's principal owner, died, and in March 1999, Paul R. Porreca (who is also now deceased) was appointed assignee for the benefit of Dorchester's creditors in the probate matter involving the disposition of the estate of Dorchester's principal.

---

[2] ISRA requires that responsible parties file remediation documents with DEP for its approval, including but not limited to, remedial investigation reports (RIR), remedial investigation workplans (RIW), remedial action workplans (RAW), and remedial action outcome reports. N.J.S.A. 13:1K-8; N.J.S.A. 13:1K-9(b)(3). At each stage, DEP and the responsible party and/or its consultant would engage in a back-and-forth process with respect to acceptability of the workplans and outcomes. N.J.S.A. 13:1K-9. Further, persons remediating an industrial establishment pursuant to ISRA were required to post and maintain a remediation funding source (RFS), which is a financial instrument like a trust, until the end of the remediation. N.J.A.C. 7:26C-5.2. The RFS was to ensure that, in the event the remediating party failed to complete the remediation, DEP had some resources to complete the work. After the responsible party complied with DEP's mandates regarding required remediation and those outcomes were deemed acceptable to the agency, the responsible party would apply for a No Further Action (NFA) letter, allowing that party to liquidate its RFS and stop paying required annual surcharges. N.J.S.A. 13:1K-8.

In September 1999, DEP inspected the Site, and throughout 2000, Porreca and DEP corresponded extensively regarding plans for the investigation and remediation of the Site with DEP identifying forty areas of environmental concern that required additional investigation. In April 2001, DEP issued a notice of ISRA violation to Dorchester for failing to conduct the minimum remediation investigation at the Site. Dorchester responded that it was planning to conduct sampling in "eight prioritized areas of concern."

In June 2001, DEP filed a verified complaint and order to show cause in the probate matter, seeking, among other actions, to compel remediation of the contamination existing at and emanating from the Site. It also alleged Dorchester failed to comply with ISRA as the site was a "suspected source[] of soil, groundwater, and surface water pollution." DEP maintained it was forced to file the complaint to ensure that Wheaton's assets would be allocated for remediation before they were distributed.

One year later, the court entered a consent order requiring Porreca to investigate and begin remediation of specific areas of the property. Additionally, the 2002 consent order further stated that the probate court retained jurisdiction over the matter, and that, "[i]f upon review of the work conducted . . . , [DEP] determines that additional remediation, i.e. remediation

6

beyond the Site Investigation, of the Shipyard Site, Hardware Site and/or Perfume Site is required, [DEP] shall advise this Court . . . ."

In the following years, Porreca endeavored to remediate the Site with DEP's oversight. In 2004, DEP issued a remedial investigation workplan approval letter which identified specific areas of concern, including the potential need for sampling of the sediment of the Maurice River. The letter confirmed DEP's acceptance of Porreca's position that "no further ecological investigations are needed" as "there [was] no indication that contaminants of concern have migrated off-site." Significantly, however, DEP stated "[i]f future ground water [remedial investigation] activities indicate that groundwater contaminants are migrating toward the river at concentrations above their respective NJ Surface Water Quality Standard, then surface water sampling may be required."

In 2005, Nicole-Kirstie entered negotiations to purchase the Site. To facilitate the sale, Porreca and DEP entered a remediation agreement which noted the sale to Nicole-Kirstie but named Porreca as the "[r]esponsible [p]erson[] executing this [r]emediation [a]greement and responsible for conducting the remediation" of the Site and referred to the 2004 workplan approval to detail Porreca's responsibilities. The agreement also stated:

> [e]xcept as otherwise set forth herein, . . . the [DEP] does not release any person from any liabilities or obligations such person may have pursuant to ISRA and

> the ISRA regulations, or any other applicable authority, nor does the [DEP] waive any of its rights or remedies pursuant thereto.

The agreement further provided it was "binding, jointly and severally, on each signatory, its successors, assignees and any trustee in bankruptcy or receiver appointed pursuant to a proceeding in law or equity."[3]

Following finalization of the sale in March 2006, and after extensive discussions between the parties regarding Porreca's obligations and compliance with the remediation agreement, DEP ultimately demanded that Porreca conduct sampling in the Maurice River. It reasoned, "[g]iven the nature of the discharge, there is no reason to believe that the areas between and potentially beyond the contaminated samples are [not] also contaminated."

In June 2006, Porreca filed an order to show cause in the probate matter supported by a "Verified Complaint for Settlement of Sixth Interim Account and Further Relief." In count three, he alleged that he "has been frustrated from concluding his duties as Assignee because of unreasonable demands asserted by [DEP] for the first time" in March 2006. He further explained that DEP "has

---

[3] Although there is no such information in the record before us, N.J.S.A. 13:1K-9(b)(2) would have required that "[t]he owner or operator shall attach a copy of any . . . remediation agreement approval . . . to the contract or agreement of sale or agreement to transfer or any option to purchase which may be entered into with respect to the transfer of ownership or operations."

A-2308-21

now introduced new demands namely sampling in the Maurice River, itself . . . which not only are unreasonable and unnecessary, but are impossible to perform at this juncture because the Assignee simply does not have the funds and has no way of generating the same."

Porreca further stated his reluctance to conduct the sampling was based on "the enormity of the costs if contaminants were found," "the historic dredging of the river by the United States Army Corps of Engineers (which it is undisputed in the past placed spoils on the shipyard site)," and "known contamination by numerous other industries located along the river as well as the river being tidally influenced." He alleged the estate "simply does not have the resources to conduct the additional remediation activities demanded by the [DEP] in its latest directive particularly sampling in the river." He, therefore, sought an order compelling DEP "to waive and relinquish its new demands" for sediment sampling and "[d]ischarging the Assignee as fiduciary."

DEP responded specifically to the third count in an August 2006 letter to the court in which it stated the relief requested runs "counter to [ISRA], the 2002 consent order, and the 2005 remediation agreement." It noted that surface water sampling of the river was first raised in its conditional approval of Porreca's RIW in October 2004, and that DEP had retained discretion to order additional remediation in the remediation agreement. Accordingly, DEP asserted it was

9

"properly exercising its statutory authority" by requiring more on- and off-site sampling of the remaining areas of environmental concern, which included the Maurice River, in order to fully delineate the extent of the contamination.

In addition to its letter, DEP filed an answer in which it denied the allegations in the verified complaint and included applicable affirmative defenses and a two-count counterclaim against Porreca alleging he violated ISRA (count one) and the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 (Spill Act) (count two). DEP specifically requested the court:

> (1) compel Porreca to abide by the terms of the July 2005 Remediation Agreement, conduct sampling in accordance with DEP's March 2006 letter, and perform such other remediation as DEP requires pursuant to ISRA and the Remediation Agreement; (2) enter declaratory judgment against plaintiff Porreca, compelling him to perform further cleanup with DEP's oversight; (3) order Porreca to reimburse DEP for all removal costs incurred as a result of the discharge of hazardous substances at the Dorchester Property; and (4) awarding DEP penalties, costs and fees.

In response, Porreca relied on DEP's 2004 RIW conditional approval letter, stating that DEP had approved "Dorchester's proposed protocol of utilizing low flow ground water sampling . . . to determine whether or not ground water contaminants are migrating towards the Maurice River at concentrations above the applicable New Jersey Ground Water Quality Standard." He alleged

10

that DEP's approval had been based on "the last . . . ground water sampling taken . . . [which] showed that the ground water quality had substantially improved from the baseline sampling taken previously . . . and that several wells using this more accurate form of sampling were found to be compliant." In addition, Porreca claimed that DEP was "barred" from seeking any penalties because it had not followed the 2002 consent order.

In October 2006, following a two-day bench trial, the probate court issued a "JUDGMENT ALLOWING FINAL ACCOUNT AND OTHER RELIEF" (the 2006 order) wherein it deemed Dorchester's "sixth interim account" to be Dorchester's "final account," and: (1) discharged Porreca as assignee; (2) allowed "Porreca the sum of $253,880.92 less a deduction based upon his pro rata share of the budget shortfall estimated to be approximately $50,000.00"; (3) permitted "the DEP Disciplinary Oversight Committee the sum of $42,214.57 representing oversight charges less a deduction based upon its pro rata share of the budget shortfall estimated to be approximately $50,000.00"; (4) allowed others a pro rata share of the budget shortfall; (5) required "[t]he sum of $50,000.00 currently held in escrow by the Assignee pursuant to the [2005] Remediation Agreement . . . shall be turned over to [DEP]"; and (6) summarily dismissed without explanation DEP's counterclaim "as to its exceptions to

11

plaintiff's final account and also as to its request for the imposition of costs and penalties."

The 2006 order mentions nothing about DEP's counterclaim to compel further cleanup and sampling, nor does it explain the court's reasoning for its decision. The parties have informed us that the transcript from the probate court proceedings are no longer available, and it is undisputed that DEP did not appeal the 2006 order. There is also nothing in the record to indicate whether DEP complied with the 2002 consent order to keep the court informed about the remediation even though it entered into remediation agreements and correspondence between 2002 and 2006.

According to the parties, there was no further communication between DEP and Nicole-Kirstie or any other party associated with the Site until June 2010. Following passage of the 2009 Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29 (SRRA), Nicole-Kirstie engaged a Licensed Site Remediation Professional (LSRP), Timothy Mangold, as required because the Site's remediation was technically still ongoing.

Mangold subsequently "conducted continued investigations into groundwater and other areas of concern." In May 2016, he submitted a remedial investigation report to DEP indicating the investigation was complete, but DEP continued to demand additional river sediment sampling and evaluation. In

12

emails submitted to us by DEP before oral argument, Mangold agreed on May 16, 2017, to "conduct further evaluation of the river sediments pursuant to N.J.A.C. 7:26E-4.8," which required him to determine if "a contaminant migration pathway" existed from the site to the river.

In February 2019, and despite the 2006 order, DEP and Nicole-Kirstie entered the ACO. The ACO names Nicole-Kirstie as "the current owner of the Site and, therefore . . . a person in any way responsible for any hazardous substance discharged at the Site pursuant to the Spill Act, and a person responsible for conducting the remediation pursuant to the [SRRA]." And it describes the "Site" as "Block 274 Lots 1 and 2, and Block 252 Lots 20 and 21, on the tax maps of Maurice River Township, Cumberland County." The ACO also describes the Site as "an Industrial Establishment pursuant to [ISRA] and is the subject of a pending ISRA matter . . . which remains open until a Response Action Outcome is issued for the former Industrial Establishment."

The ACO further declares that, because there had been "lack of a complete remedial investigation by the statutory timeframe" after discovery of the discharge at the Site prior to May 8, 1999, DEP took "direct oversight of the remediation of the Site" as required pursuant to the SRRA's requirements in N.J.S.A. 58:10C-27(c) and also citing N.J.A.C. 7:26C-14.2(b).

13

Consequently, the ACO states that "[w]ithout any admission of fact, fault, or liability, Nicole-Kirstie agrees to remediate, pursuant to this [ACO], all hazardous substances, hazardous wastes, and pollutants discharged at the Site." Additionally, among other stated responsibilities, the 2019 ACO requires Nicole-Kirstie: (1) to conduct "a remedial investigation of the Contaminated Site" pursuant to N.J.A.C. 7:26E-4, and submit to DEP by the end of June 2020 "a remedial investigation report," pursuant to N.J.A.C. 7:26E-4.9; (2) to "remediate the Contaminated Site, including all discharges at the Site discovered during the remediation" as DEP directs and according to the 2019 ACO and applicable statutes and regulations; and (3) pay a $12,500 civil penalty "for past violations of N.J.A.C. 7:26C-14.2(b) . . . ." The ACO defined the "Contaminated Site" as the "Site and all other areas to which any hazardous substance discharged on the Site has migrated . . . ."

In addition, the ACO sets forth stipulated penalties and other enforcement for noncompliance, including:

> issuing an administrative order, assessing a civil administrative penalty, filing of a summary action in the Superior Court . . . to enforce this [ACO] as a final order, enforcing this [ACO] as an order issued by [DEP] pursuant to the Spill Act, and issuing a Spill Act directive, conducting the remediation itself and recovering three times [DEP]'s costs.

14

Further, the ACO states under "General Provisions" that Nicole-Kirstie "consents to entry of this [ACO] and waives its right to request an administrative hearing concerning the terms of this [ACO]" and waives its right to "an administrative hearing concerning stipulated penalties." Nicole-Kirstie also agreed not to contest the ACO's "terms or conditions hereof, except that Nicole-Kirstie does not waive its right to contest the interpretation or application of such terms and conditions in an action or proceeding brought by [DEP] to enforce this [ACO]."

The parties disputed whether the 2006 court order determined the investigation of impacts to the Maurice River was complete and whether that order applied to Nicole-Kirstie. According to Mangold's 2021 certification, the claim for further investigation of the Maurice River was the sole issue outstanding preventing him from issuing a site-wide Response Action Outcome to close the case.

Mangold certified he investigated his and DEP's file regarding the Site, consistent with his responsibilities under the SRRA, and located an internal memorandum written by DEP Assistant Commissioner for Site Remediation Mark Pedersen, which is not in the record but stated, in discussing the 2006 litigation, "[t]he Superior Court absolved the responsible party of the requirement to test the sediments in the Maurice River." That, in turn, sparked

15

further unsuccessful attempts at discussion between Nicole-Kirstie and DEP regarding the effect of the 2006 order on the ACO and Nicole-Kirstie's cleanup responsibilities.

In June 2019, Mangold submitted a certified RIR, which DEP found not complete based on his failure to perform a remedial investigation of the Maurice River. DEP sent Nicole-Kirstie a letter in November 2020 formally advising that the remedial investigation was still not complete, as required by the 2019 consent order. It asserted:

> Nicole-Kirstie, LLC's position with respect to the 2006 Court Order is without merit. Nicole-Kirstie, LLC is not a party to the 2006 Court Order entered into solely between the [DEP] and Dorchester and the 2006 Court Order is not binding or have any other impact [sic] on future property owners. Nicole-Kirstie, LLC remains fully responsible under the [2019 consent order] and applicable environmental statutes.

In response, Mangold sent an email to DEP outlining his and Nicole-Kirstie's position that the 2006 order controlled and did not require any additional investigation of the Maurice River. Specifically, he argued the order finally resolved the ISRA case for the Site, including "[t]he issue of any requirement to sample the Maurice River and its sediments, and the remediation of same," and stressed DEP's failure to appeal that order. Mangold also noted

Nicole-Kirstie actively participated in the proceedings culminating in the 2006 order, despite being specifically excluded as a responsible party by DEP.

DEP replied on April 14, 2021 with a one-paragraph email providing its "final thoughts on the matter." It explained "[t]he applicability of the 2006 [c]ourt [o]rder to [Nicole-Kirstie] is an issue that has been carefully considered by" DEP and reasoned "the 2006 [o]rder does not operate as a final remediation document (i.e. a No Further Action Letter or Response Action Outcome), and does not provide language stating that it should be considered as such." DEP concluded the order resolved "a remediation agreement and litigation between [DEP] and [Dorchester], neither of which was Nicole-Kirstie a party to," and nothing in that order provided it would be binding on parties other than DEP and Dorchester. It noted Nicole-Kirstie was not joined in the litigation because "it was not a necessary party under R[ule] 4:28."

Nicole-Kirstie filed a Notice of Appeal challenging the DEP's April 2021 email. On our own motion, we dismissed the appeal after concluding "the email does not constitute an appealable final agency decision of the [DEP] under Rule 2:2-3(a)(2)." In re Nicole-Kirstie LLC, slip op. at 4. We also remanded the matter "for the Commissioner to issue a decision either adopting or rejecting the position espoused in the [Deputy Attorney General (DAG)]'s April 14, 2021 email, without prejudice to the [DEP] arguing on any future appeal from the

Commissioner's disposition that the appeal is time barred and should have been filed before the DAG's email." Ibid.

In response to our order, DEP issued a February 16, 2022 letter in which it explained its "final decision relevant to this matter is encapsulated by the February 19, 2019 [ACO] . . . which outlines Nicole-Kirstie's remedial obligations" under various statutes, including ISRA, SRRA, and the Spill Act. It stated the 2021 email "merely reiterates that the [ACO] is a final order and does not convey [DEP]'s 'final thoughts on this matter' or affect the underlying [consent order]." Because Nicole-Kirstie never appealed that order, DEP concluded it "remained in full force and effect."

On April 1, 2022, Nicole-Kirstie appealed from the February 16 letter. DEP subsequently moved to dismiss the appeal as time-barred and argued that Nicole-Kirstie's appeal actually sought to challenge the 2019 ACO, the "only final agency decision regarding the property," and as such was untimely. Additionally, DEP contended Nicole-Kirstie was aware of the probate litigation and resulting order at the time but never raised them during negotiations leading to the 2019 ACO or in the two years following the ACO's issuance.

On June 14, 2022, we denied DEP's dismissal motion with directions for the merits panel to "consider, among any other issues presented, the appealability of the alleged agency action(s) and the timeliness of the appeal."

Thereafter, in July 2024, we concluded that DEP's February 2022 letter lacked the necessary factual findings to permit thorough appellate review as to whether the 2006 probate court order barred DEP from requiring Nicole-Kirstie to conduct investigation and sediment sampling in the Maurice River as part of its remediation responsibilities. In re Nicole-Kirstie LLC, slip op. at 2. We also found we "cannot determine whether Nicole-Kirstie's appeal is timely without a full understanding of precisely what []DEP considered in its determination of the issue, and when it did so." Id. at 16. We therefore remanded the matter to DEP to supplement the administrative record pursuant to Rule 2:5-5(b) and retained jurisdiction. Id. at 2, 16.

Specifically, we ordered DEP to make factual findings relating to four inquiries:

> (1) the outcome of Porreca's request for an order "[c]ompelling the [DEP] to waive and relinquish its new demands" for sediment sampling; (2) the outcome of [DEP]'s counterclaim requesting an order "compelling [Porreca] to conduct sampling"; (3) the basis for the court's October 17, 2006 order "dismiss[ing] the [c]ounterclaim filed by the [DEP] as to its exceptions to [Porreca]'s final account and . . . its request for the imposition of costs and penalties; and (4) why, given [DEP]'s knowledge of the dispute regarding sediment sampling and its participation in the 2006 litigation, it did not specifically require Nicole-Kirstie to sample and remediate the Maurice River sediments in the 2019 consent order.

19

[Id. at 15 (alterations in original).]

We explained that these "'unadduced' facts are 'material to the issues on appeal,' and 'necessary to a just outcome,'" ibid. (citations omitted), because:

> [t]he court's rationale, the outcomes of Porreca's and []DEP's requests for injunctive relief in 2006, and the parties' actions in response to that litigation may directly bear upon whether []DEP's demand for sediment sampling in the Maurice River was "finally determined on the merits" by the probate court and thus "cannot be relitigated . . . in a new proceeding," Velasquez v. Franz, 123 N.J. 498, 505 (1991) (discussing res judicata), and whether preclusion based on [DEP]'s failure to bring its claim against Nicole-Kirstie in 2006 would be "unfair in the totality of the circumstances," Bank Leumi USA v. Kloss, 243 N.J. 218, 227 (2020) (discussing the entire controversy doctrine). We cannot determine whether the 2006 litigation should be given preclusive effect without a full understanding of its outcome. Similarly, we cannot determine whether Nicole-Kirstie's appeal is timely without a full understanding of precisely what [DEP] considered in its determination of the issue, and when it did so.

[Id. at 15-16.]

On December 17, 2024, DEP submitted its response to the court's remand order.

In response to our first inquiry, DEP answered that "the inquiry appears to refer to Porreca's June 12, 2006 Verified Complaint for Sixth Interim Account and Further Relief," and it contended the probate court "did not make any specific ruling on this request when it issued its October 17, 2006 order that

dismissed Porreca as Assignee and dismissed DEP's counterclaim." With respect to our second question, DEP responded that the counterclaim submitted by DEP with its answer against the June 2006 complaint filed by Dorchester and the Wheaton estate was dismissed by the probate court "as part of its October 17, 2006 Order closing the probate matter" and quoted the court's order. In response to our third inquiry, DEP answered that "[t]he Probate Court's October 17, 2006 Order closing the case did not explain the basis of or rationale for its dismissal of [DEP]'s counterclaim" and stated neither a written transcript nor an audio recording was available. As a result, DEP again asserted it did not know "the specific basis of the . . . October 17, 2006 Order."

Nevertheless, DEP submitted what it characterized as "further context" for its answer, in which it stated:

> After Mr. Wheaton's passing in 1998, Dorchester Industries ceased operation of the Industrial Establishment, thereby triggering the reporting and remediation requirements of [ISRA]. The Department assigned the matter ISRA Case Number E99533. In 2002, the Probate Court entered a consent order requiring the Assignee to prepare a site investigation report and a workplan for further remediation. Following the submission of the required workplan, in 2004 the Department conditionally approved the document in a letter ("2004 Workplan Approval Letter") that identified specific areas of concern, including the potential need for sampling of Maurice River surface water and sediments.

In 2005, to facilitate the planned transfer of the Property from Dorchester Industries to Nicole-Kirstie, the Department and the Assignee entered into an agreement pursuant to ISRA ("2005 Remediation Agreement") that identified Porreca, on behalf of Dorchester Industries, as the person responsible for conducting the remediation, referred to the 2004 Workplan Approval Letter in detailing the Assignee's specific remediation responsibilities, and provided that decisions about the sufficiency and acceptability of submissions made to [DEP] would be made solely by the Department. It also provided that Porreca would place $125,000 in escrow, which Porreca drew upon over the years to pay the costs associated with the remediation. On March 15, 2006, following the transfer of the Property to Nicole-Kirstie in November 2005, the Department wrote a letter to the Assignee that required the Assignee to conduct sediment sampling in the Maurice River in and adjacent to the rail/lift areas pursuant to the 2005 Remediation Agreement. The Assignee declined to conduct the required sampling, instead filing the June 12, 2006 Complaint.

While the Probate Court did not explain why it dismissed [DEP]'s counterclaim, it did order that the remaining $50,000 that the Assignee held in escrow pursuant to the 2005 Remediation Agreement be given to the Department so that the ongoing clean-up and remediation process could continue, as opposed to allocating the monies for the benefit of creditors of Dorchester Industries and the Estate. [DEP] read this as a reflection of the Probate Court's determination that the need for additional testing and sampling had been proven.

The Department did not appeal the Probate Court's October 17, 2006 Order of dismissal because (1) the Assignee did not have the funds to conduct the necessary remediation and (2) having acquired the

22

property on November 28, 2005, Nicole-Kirstie was a person responsible for conducting the remediation pursuant to the Spill Act . . . and the Brownfield Act, . . . which impose strict liability on post-September 13,1993 purchasers of real property for all remediation costs if they knew or should have known of a prior discharge of hazardous substances at the property.

The Department understands that environmental matters were not litigated during the course of the 2-day Probate Court trial in September 2006. The parties to the Probate Court proceedings neither engaged in discovery that was related to environ-mental matters nor presented any written evidence or oral testimony on environmental issues to the Probate Court. The Probate Court, therefore, did not consider any environmental evidence when it dismissed [DEP]'s counterclaim without analysis or explanation.

DEP also understands that the Probate Court's October 17, 2006 Order did not close out the open ISRA matter (Case Number E99533) that was triggered in 1999 in connection with Dorchester Industries' cessation of operations, did not make any specific findings or rulings regarding the required sampling of the Maurice River, and did not apply to anyone other than the Assignee (as the representative of Dorchester Industries) and the Department.

Finally, in response to our fourth inquiry, DEP stated it did not specifically require Nicole-Kirstie to sample and remediate the Maurice River sediments in the 2019 ACO:

because Nicole-Kirstie was already required to do so pursuant to the Department's Technical Requirements for Site Remediation ("Tech Regs"), N.J.A.C. 7:26E, and because it had already been made aware of the need

to conduct such sampling in prior communications. The 2019 ACO's general references to remediation requirements set forth in statutes and [DEP] regulations were also consistent with [DEP] practice involving such documents following the enactment of the [SRRA] in 2009.

DEP further claimed that "Nicole-Kirstie recognized that it was required to remediate the Maurice River prior to its execution of the 2019 ACO with the Department." In support, DEP stated:

On June 7, 2010, the Department issued a letter to Nicole-Kirstie explaining that the Dorchester Industries ISRA case (Case Number E99533) was still open and that Nicole-Kirstie was a person responsible for conducting the remediation as defined in the Department's Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS Rules"), N.J.A.C. 7:26C. Nicole-Kirstie responded to the June 7, 2010 Letter by retaining [its first LSRP] in February 2011 . . . . Retention of the LSRP constituted Nicole-Kirstie's acknowledgement that it was required to conduct remediation. Nicole-Kirstie has continued to retain an LSRP through the present day . . . . Through LSRP Mangold, Nicole-Kirstie submitted to the Department a remedial investigation report for the entire Site ("RIR-E") on May 7, 2016.

On or about May 2, 2017, the Department's Bureau of Inspection & Review ("BIR") informed the LSRP that the RIR-E did not include a current ecological evaluation as required by [regulations] and the Department's Ecological Evaluation Technical Guidance. The Department also informed the LSRP that the sediment samples had been[:]

24

. . . inappropriately compared to the human health based Soil Remediation Standards. As the Maurice River meets the definition of an environmentally sensitive natural resource, the sediment results should have been compared to the ecologically based sediment screening levels. . . . There are several contaminants that exceed their respective sediment screening criteria such as Cu [copper], Pb [lead], Ni [nickel], and Zn [zinc].

In a follow-up email dated July 14, 2017, BIR directed the LSRP to withdraw the RIR-E; otherwise, [DEP] would determine it to be incomplete. Because the LSRP did not withdraw the RIR-E, on July 31, 2017, the Department noted the proffered RIR-E as "rejected-incomplete" due to incomplete ecological delineation of the Maurice River, which triggered compulsory Direct Oversight pursuant to N.J.A.C. 7:26C-14.2 due to the failure to conduct a complete remedial investigation no later than the extended statutory timeframe of May 7, 2016.

Thereafter, DEP cited to the 2019 ACO and Nicole-Kirstie's agreement to "settle the violations" related to its failure to complete the remedial investigation, comply with provision of DEP's direct oversight, and remediate "the Contaminated Site, including all discharges at the Site discovered during the remediation as DEP directs . . . ." DEP noted that in addition to the specific definition of "Contaminated Site" in the 2019 ACO as "[t]he Site and all other areas to which any hazardous substance discharged on the Site has migrated,"

N.J.A.C. 7:26E-1.8 defines it as "all portions of environmental media and any location where contamination is emanating, or which has emanated there from."

DEP further asserted, citing N.J.A.C. 7:26E-3.6, that in every case governed by its Tech Regs and ARRCS Rules, "the party conducting the remediation must conduct sampling in all environmental media to fully delineate the extent of contamination, both on-site and off-site, including in surface water and sediments." In sum, DEP claimed that it did not specifically require Nicole-Kirstie to sample and remediate the Maurice River sediments in the 2019 ACO because those requirements were already spelled out in its Tech Regs and its Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C, which Nicole-Kirstie and its LSRP are required to follow. DEP cited N.J.A.C. 7:26E-3.6, for example, claiming that regulation requires "the party conducting the remediation must conduct sampling in all environmental media to fully delineate the extent of contamination, both on-site and off-site, including in surface water and sediments."

Thus, DEP concluded, based on those facts, that "Nicole-Kirstie was already aware of the Department's determination that it had failed to conduct sufficient evaluation of impacts in the Maurice River and had agreed to address the deficiencies identified by the Department," so "[t]here was no need to spell out the requirement to sample and remediate Maurice River sediments in

26

specific and explicit detail both because the Department's regulations already required it and because Nicole-Kristie was aware of that requirement."[4]

II.

We first address the parties' dispute regarding the timeliness of this appeal. As noted, we previously denied DEP's dismissal motion with directions for the merits panel to "consider, among any other issues presented, the appealability of the alleged agency action(s) and the timeliness of the appeal." In re Nicole-Kirstie LLC, slip op. at 4. Nicole-Kirstie contends its appeal timely challenges DEP's February 2022 letter, which it claims is a final, appealable agency decision.

DEP argues, as it did in its initial motion, that Nicole-Kirstie's appeal actually seeks to challenge the 2019 ACO and, as such, was untimely. It claims that remediation of the Maurice River and its off-site receptors is an integral part of the 2019 ACO and that Nicole-Kirstie had multiple opportunities to clarify the extent of its responsibility but chose not to do so. We are satisfied that the DEP's February 2022 letter to Nicole-Kirstie was an appealable final agency decision and that Nicole-Kirstie's appeal was timely.

In its February 16, 2022, letter to Nicole-Kirstie, DEP stated:

---

[4] The parties, by consent, supplemented the record with additional materials before oral arguments.

The court's order remanded this matter to the New Jersey Department of Environmental Protection ("Department") and directed the Commissioner of the Department to "issue a decision either adopting or rejecting the position espoused in the DAG's April 14, 2021 email."

To clarify the issue at hand, the Department's final decision relevant to this matter is encapsulated by the February 19, 2019, Administrative Consent Order ("ACO") entered into between Nicole-Kirstie and the Department, which outlines Nicole-Kristie's remedial obligations under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24, the Industrial Site Recovery Act, N.J.S.A. 13:1K-1 to -18, the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31, the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, the Administrative Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C, and the Technical Requirements for Site Remediation, N.J.A.C. 7:26E. By its express terms, the ACO provides that it shall be enforceable in Superior Court as a final order. Further, Paragraph 42 of the ACO provides that Nicole-Kirstie shall not contest its terms or conditions.

The DAG's April 14, 2021 email merely reiterated that the ACO is a final order, and does not convey the Department's "final thoughts on this matter" or affect the underlying ACO. Nicole-Kirstie has never filed an appeal of the ACO/final decision; for this reason, the ACO has remained in full force and effect since February 19, 2019, and continues to remain in effect today.

Pursuant to Rule 2:2-3(a)(2), an appeal may be taken as of right "to review final decisions or actions of any state administrative agency or officer." Our

Supreme Court has directed that an agency decision "should contain adequate factual and legal conclusions [and] should give unmistakable notice of its finality." In re CAFRA Permit No. 87-0959-5, 152 N.J. 287, 299 (1997). Further, "[t]o be considered a final judgment appealable as of right, the order must generally dispose of all issues as to all parties." CPC Int'l, Inc. v. Hartford Acc. & Indem. Co,, 316 N.J. Super. 351, 365 (App. Div. 1998). See Silviera-Francisco v. Bd. of Educ. of City of Elizabeth, 224 N.J. 126, 136 (2016) ("Generally, an order is considered final if it disposes of all issues as to all parties."). Moreover, "[c]ertain matters may become final because of their effect on the disposition of the case as a whole." Jeffrey S. Mandel, Current N.J. Appellate Practice, § 2:3-1(b)(4) (2025). See, e.g., In re Proposed Xanadu Redevelopment Project, 402 N.J. Super. 607, 630-31 (App. Div. 2008) ("an advisory opinion of an administrative agency is ordinarily not appealable" but court granted leave to appeal "given the present procedural posture and the interests of judicial economy"); In re Determination by Dir. of Div. of Alcoholic Beverage Control, 392 N.J. Super. 577, 581 (App. Div. 2007) ("The prohibition against review of advisory opinions is not absolute, however. It may be overcome where an administrative determination 'is tantamount to final agency action[,]' i.e., resulting in 'action . . . directly felt by appellants.'").

29

Here, despite the less-than-perfect clarity as to its appealability, DEP's February 2022 letter disposes of all general river investigations and remediation issues as to the parties. Further, despite Nicole-Kirstie's agreement in the 2019 ACO that it would not "contest . . . the terms or conditions hereof," there is no clear indication that DEP in the record refused to consider Nicole-Kirstie's or its LSRP's arguments as to the scope of the required investigation and remediation or their challenges to DEP's review of their submitted remediation documents. Further, in the context of the parties' past interactions and communications regarding sediment sampling, the letter adopts the position set forth in the April 2021 email that the 2006 order does not limit DEP's ability to order sampling as part of remediation of the shipyard site.

Thus, we are satisfied DEP's February 16, 2022, letter to Nicole-Kirstie is an appealable final agency decision based on the circumstances here. Because Nicole-Kirstie filed its initial notice of appeal from that letter within forty-five days on April 1, 2022, the appeal was timely pursuant to Rule 2:4-1(b).

### III.

Nicole-Kirstie next contends that DEP failed to comply with our remand order as it offered no new evidence or documentation to supplement the record and therefore failed to provide any of the missing information supporting its position. We are unpersuaded by these arguments because, on remand, DEP

followed the court's remand instructions by answering its inquiries, even though it could not locate additional requested information and therefore did not submit it.

When the record is insufficient for an appellate court to discharge its function, a remand to the agency may be warranted. In re Carluccio, 426 N.J. Super. 15, 32 (App. Div. 2012); Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001). Further, when the appellate court directs an administrative agency to act, "the appellate judgment becomes the law of the case and the agency is under a peremptory duty not to depart from it." Lowenstein v. Newark Bd. of Educ., 35 N.J. 94, 116-17 (1961). Whether or not in agreement with the court, agencies have "a duty to obey the mandate of [the Appellate Division] 'precisely as it is written.'" In re Denial of Reg'l Contribution Agreement Between Galloway Township & City of Bridgeton, 418 N.J. Super. 94, 100-01 (App. Div. 2011) (quoting Flanigan v. McFeely, 20 N.J. 414, 420 (1956)).

An agency's discretion "must be exercised in a manner that will facilitate judicial review." R&R Mktg., LLC v. Brown-Forman Corp., 158 N.J. 170, 178 (1999). As a result, an administrative agency should "articulate the standards and principles that govern [its] discretionary decisions in as much detail as possible." Van Holten Grp. v. Elizabethtown Water Co., 121 N.J. 48, 67 (1990) (quoting Crema v. N.J. Dep't of Env't Prot., 94 N.J. 286, 301 (1983)). However,

"[a]ll of the evidential data" submitted to an agency "need not be repeated or even summarized, nor need every contention be exhaustively treated." In re Application of Howard Sav. Inst. of Newark, 32 N.J. 29, 53 (1960). A decision "is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." Ibid. Even where an agency's findings are not as "full and well organized" as they could be, a reviewing court need only "understand fully the meaning of the decision and the reasons for it." Ibid.

We are satisfied that DEP answered the court's four inquiries with the materials it could find and, by citing to applicable statutes, regulations, and the ACO's provisions itself, adequately explained its reasons for not specifically requiring Nicole-Kirstie to sample and remediate the Maurice River sediments in the 2019 ACO. We therefore reject Nicole-Kirstie's arguments and conclude DEP complied with our remand instructions and order.

IV.

Nicole-Kirstie also contends the related, preclusive doctrines of res judicata and the entire controversy doctrines (ECD) bar DEP from requiring it to conduct any further sediment sampling and remediation in or near the Maurice River based on the results of the concluded probate proceedings. We reject Nicole-Kirstie's arguments because we are satisfied, even accepting its

32

arguments with respect to the jurisdictional competence of the probate court, it has not sufficiently established the 2006 probate matter and 2019 ACO concern the same issues and causes of action, nor are we satisfied on this record that the 2006 probate matter was final judgment on the merits where DEP had an opportunity to fully litigate its counterclaim.

To the extent the probate matter addressed DEP's request for sampling, we conclude the court only did so as it pertained to a final accounting of Wheaton's estate and did not obviate Nicole-Kristie from its clear environmental cleanup responsibilities in the 2019 ACO, to which it voluntarily signed and agreed. We are also convinced the principles of efficiency and fairness underlying res judicata and the entire controversy doctrine simply do not support the drastic relief Nicole-Kirstie requests.

We first discuss the familiar and deferential standard of review principles that guide our analysis. "In light of the executive function of administrative agencies, the judicial capacity to review administrative actions is severely limited." In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1, 117 N.J. 311, 325 (1989). "An appellate court may reverse an agency decision if it is arbitrary, capricious, or unreasonable." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013).

33

> [A]lthough sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role [in reviewing an agency action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995)).]

See Worthington v. Fauver, 88 N.J. 183, 204-05 (1982) ("Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of circumstances.") (quoting Bayshore Sewerage Co. v. N.J. Dep't of Env't Prot., 122 N.J. Super. 184, 199 (Ch. Div. 1973), aff'd o.b., 131 N.J. Super. 37 (App. Div. 1974)). An abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). The burden of demonstrating that the agency's action is reversible rests upon the challenger. Lavezzi v. State, 219 N.J. 163, 171 (2014).

We next turn to a substantive discussion of the preclusive principles upon which Nicole-Kirstie relies. It first argues that DEP's position requiring sediment sampling in the Maurice River is barred by the doctrine of res judicata and exclusively relies on the probate court's 2006 order dismissing DEP's counterclaim seeking sediment sampling from Porreca as assignee. It maintains the order was a final judgment on the merits, entered "after a two-day trial in which the court took testimony and heard the parties litigate fully their respective positions." Nicole-Kirstie also points out DEP never appealed or challenged the order.

Nicole-Kirstie further argues that DEP's claim against it "comprises the same cause of action, and involves basically the same issues, as the [DEP]'s failed claim against the Assignee" in 2006, as "the acts complained of and the demand for relief are the same" and rest on the same evidence as in the probate litigation. It contends both claims share a single underlying theory, that is, "the alleged 'common-sense' notion that the presence of metal contaminants in the [shipyard site] warranted sampling of the river sediments despite a lack of evidence of any such migration," and DEP's position that under ISRA and the Spill Act, it has "unfettered discretion even to retract a prior administrative approval."

Also, Nicole-Kirstie asserts it is in privity with Porreca as it "acquired the same property interest the Assignee had and was victim to the same detrimental reliance as was the Assignee." In support, Nicole-Kirstie points to a May 2017 email wherein DEP stated that "it had demanded 'additional sampling' from the Assignee," and "since the Assignee had 'not satisfied' the DEP's demand, 'Dorchester'—presumably meaning Nicole-Kirstie—'must address this contamination' through further sampling." Finally, Nicole-Kirstie argues principles of fairness, judicial economy, and stability support its position. It asserts that it would be fundamentally unfair for DEP to attempt to repeat the same claim and theories on which it fully argued, lost, and chose not to appeal in 2006.

In response, DEP argues that res judicata is inapplicable because Nicole-Kirstie was not a party to the 2006 litigation or the underlying 2005 remediation agreement between DEP and Porreca as assignee, and its liability for contamination under the Spill Act and ISRA was not adjudicated in the 2006 litigation. DEP further contends the issues are not identical because the 2006 order resolved Porreca's request to be relieved from the 2005 remediation agreement while the current matter involves Nicole-Kirstie's obligations under the 2019 ACO. It notes the basis for the 2005 remediation agreement and 2006 litigation was "the actions (and inactions) of Dorchester, not Nicole-Kirstie."

36

Additionally, DEP contends Nicole-Kirstie's obligations and liability were not litigated, nor could they have been, as the court's jurisdiction was limited to probate matters. Finally, DEP claims that both parties made knowing concessions in the 2019 ACO, and it asserts that it accepted a lower penalty because Nicole-Kirstie agreed to conduct all remaining remediation.[5]

"The doctrine of res judicata 'contemplates that when a controversy between parties is once fairly litigated and determined[,] it is no longer open to relitigation.'" Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 172 (App. Div. 2000) (italicization omitted) (quoting Lubliner v. Bd. of Alcoholic Beverage Control for City of Paterson, 33 N.J. 428, 435 (1960)). It provides that "a cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding." Velasquez, 123 N.J. at 505. Further, because res judicata is an affirmative defense, Rule 4:5-4, Nicole-Kirstie, as the "party asserting preclusion[,] must carry the burden of establishing all necessary elements." Taylor v. Sturgell, 553 U.S. 880, 907 (2008) (citations omitted).

_____

[5] Nicole-Kirstie maintains it does not seek to be released from the 2019 ACO but notes DEP did not rely upon the 2019 ACO as the basis for demanding investigation and remediation of the river sediments until November 2020 despite raising its demands for sediment sampling in 2017.

Our Supreme Court has recognized "there are important goals to be achieved from the prudent and selective application in administrative proceedings of such doctrines as res judicata, collateral estoppel, and the single controversy rule." Golian v. Golian, 344 N.J. Super. 337, 342 (App. Div. 2001) (quoting City of Hackensack v. Winner, 82 N.J. 1, 31 (1980)). The principles underlying res judicata include "'finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness[.]'" First Union Nat. Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007) (alteration in original) (quoting Hackensack v. Winner, 82 N.J. 1, 32-33 (1980)). These policy principles of efficiency and fairness "have an important place in the administrative field." Hennessey v. Winslow Township, 183 N.J. 593, 599 (2005) (quoting Hackensack, 82 N.J. at 32-33).

For res judicata to apply, three elements must be established:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.
>
> [Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 422 (App. Div. 2011) (quoting Watkins v. Resorts Int'l Hotel & Casino, Inc., 124 N.J. 398, 412 (1991)).]

38

That is, application of res judicata requires "substantially similar or identical causes of action and issues, parties, and relief sought," in the two proceedings, "as well as a 'final judgment by a court . . . of competent jurisdiction'" in the first proceeding. N.J. Div. of Child Prot. & Permanency v. J.Y., 467 N.J. Super. 235, 244 (App. Div. 2021) (ellipses in original) (quoting Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460 (1989)). "If given preclusive effect, the prior judgment will bar not only the matters actually determined in the previous proceedings, but also all claims that could have been raised in the first action." Bondi, 423 N.J. Super. at 422.

For a judgment to be final, the party whose claim is being sought to be barred must have "'had a fair and reasonable opportunity' to fully litigate that claim in the first action." Bondi, 423 N.J. Super. at 422 (citing Cafferata v. Peyser, 251 N.J. Super. 256, 261 (App. Div. 1991)). Our Supreme Court has held claim preclusion "can [not] result from a judgment . . . if that judgment was not rendered on the merits." Ibid. (quoting Watkins, 124 N.J. at 422). Typically, the merits of a claim are adjudicated during "a full trial of the substantive issues," but, increasingly, "statutes, rules, and court decisions" operate to bar retrial of judgments not "on the substance of a claim." Velasquez, 123 N.J. at 506-07 (citing Restatement (Second) of Judgments, § 19).

For two claims to grow out of the same occurrence, the claims must involve "substantially similar or identical causes of action and issues, parties, and relief sought." Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 595 (2015) (quoting Culver, 115 N.J. at 459). Our Supreme Court has observed that this element of res judicata is "the most difficult to determine . . . ." Ibid. To determine whether the claims are sufficiently similar, the court must examine:

> (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same.
>
> [Wadeer, 220 N.J. at 606-07 (quoting Culver, 115 N.J. at 461-62).]

Next, although "[j]udgments or orders normally do not bind non-parties," N. Haledon Fire Co. No. 1 v. Borough of N. Haledon, 425 N.J. Super. 615, 628 (App. Div. 2012) (quoting In re Application of Mallon, 232 N.J. Super. 249, 254 n.2 (App. Div. 1989)), they may "be binding upon non-parties in other matters if their interests have been represented by a party." Ibid. "Res judicata will apply if a party in the second action is in privity with a party in the first action." Brookshire Equities, 346 N.J. Super. at 319. "[S]uccession to the same rights to

40

property" establishes a privity of interest for res judicata purposes. Rutgers Cas. Ins. Co. v. Dickerson, 215 N.J. Super. 116, 122 (App. Div. 1987).

As noted, the 2006 order substantively reflects the final accounting of Wheaton's estate. The court decided each creditor's pro rata share of the budget shortfall and discharged Porreca as assignee for the benefit of the creditors. In the penultimate paragraph of its order, the court also dismissed DEP's counterclaim "as to its exceptions to plaintiff's final account and also as to its request for the imposition of costs and penalties." Notably, the court does not discuss the nature, scope, or substance of DEP's counterclaim at any other point.

In the context of probate proceedings, like the 2006 order, we note a final accounting is the last step to close an estate, distribute assets to the estate heirs, and pay the creditors who have filed legitimate claims. N.J.S.A. 3B:17-8 establishes the finality of such a judgment, prohibiting further legal challenge to the accuracy or propriety of the account. In re Skvir's Est., 170 N.J. Super. 559, 562 (App. Div. 1979) (referring to predecessor statute, N.J.S.A. 3A:9-8); Van Der Veer v. Ames, 6 N.J. Super. 143, 146 (App. Div. 1950) (same). These judgments act to "exonerate and discharge the fiduciary from all claims of all interested parties and of those in privity with or represented by interested parties except . . . [a]s relief may be had from a judgment in any civil action." Ibid.

41

We also note N.J.S.A. 13:1K-11.1 provides, in part, at the "event of the closing termination, or transfer of an industrial establishment, which . . . is all or part of a trust . . . or estate . . . , only the assets of the trust or estate . . . shall be subject to the obligation to remove the discharge . . . ." Thus, at the final accounting in 2006, the estate was liable only for removing the discharge to the extent of the amount of estate assets remaining after distribution to the previous owner's creditors.

As it was merely the disposition of a final accounting, further constrained by N.J.S.A. 13:1K-11.1, it is hardly surprising – in fact would have been fully expected – that the probate court's judgment mentions nothing substantively about DEP's counterclaim or any continuing obligation for remediation. This lack of reasoning by the court supports our conclusion that it is hardly clear, contrary to Nicole-Kirstie's arguments, that DEP had "'a fair and reasonable opportunity' to fully litigate that claim in the first action." Bondi, 423 N.J. Super. at 422 (citing Cafferata, 251 N.J. Super. at 261). Because of the court's lack of clarity and barren record with respect to DEP's counterclaim, we are convinced Nicole-Kirstie has not met its burden under the first element of res judicata.

In light of these dispositional differences between the 2006 probate matter and the 2019 ACO, we are also satisfied Nicole-Kirstie has not established the

matters concern the same issues or causes of actions. Because of the differences between the proceedings, we are convinced the "theor[ies] of recovery" are simply not sufficiently similar. Wadeer, 220 N.J. at 606-07. As the order related to the final accounting of a probate matter, we are also unconvinced that DEP would introduce the same evidence and witnesses to support its counterclaim, as it would now. Ibid. We are also satisfied that the material facts alleged are hardly the same because the DEP's counterclaim concerned the actions of the previous owner and Porreca as assignee, not Nicole-Kirstie more than a decade later. As the record reflects a lack of identity of the core and critical issues or causes of action between the probate matter and the 2019 ACO, we are convinced res judicata does not bar DEP's requirement that Nicole-Kirstie conduct further investigation and remediation of the Site and Maurice River.

Importantly, as detailed in n. 4, Nicole-Kirstie acknowledges that it does not seek to be released from the 2019 ACO and instead argues, however, that the 2019 ACO "provides no independent basis for the [DEP]'s claim against [it] to sample and remediate the Maurice River sediments" as it simply "describes the scope of Nicole-Kirstie's overall responsibility in generic terms." It contends the ACO cannot extend the DEP's discretion, which was limited as it relates to this matter by the 2006 court order. We fundamentally disagree.

43

In State v. Bernardi, 456 N.J. Super. 176, 189 (App. Div. 2018), the court held that "[an] ACO is an agreement between [parties] and the [DEP] which, by its express terms, may be enforced by the parties. In other words, under the common meaning of the term, the ACO is a contract as a matter of fact." Ibid. As the court explained, an ACO being an order:

> does not alter its status as an enforceable contract. Our Supreme Court has recognized that a consent judgment is "an agreement of the parties under the sanction of the court . . . ." Cmty. Realty Mgmt., Inc. v. Harris, 155 N.J. 212, 226 (1998) (citation omitted). The ACO is no different than a consent order in that it incorporates the contractual agreement of the parties and also constitutes an order, enforceable by both parties, requiring compliance with its terms. The inclusion of the parties' agreement into a binding order does not render the ACO something other than a contract. To the contrary, the ACO constitutes a contract which includes an agreed-upon method to ensure compliance with its terms – enforcement of the order.
>
> [Id. at 189-90 (citation omitted).]

See also N.J. Dep't of Env't Prot. v. Bayshore Reg'l Sewerage Auth., 340 N.J. Super. 166, 172-73 (App. Div. 2001) (finding party "bound itself contractually to the terms of" administrative consent order); E.I. Du Pont de Nemours & Co. v. State, Dep't of Env't Prot. & Energy, 283 N.J. Super. 331, 351-52 (App. Div. 1995) (affirming DEP's authority to enter into administrative consent order, and

observing that if a private party "chooses not to enter into such an agreement, it may do so").

Here, because the 2019 ACO is an enforceable contract, Nicole-Kirstie bargained away its rights to contest the terms or DEP's authority when it "waive[d] its right to request an administrative hearing concerning the terms of this [ACO]" and "agree[d] not to contest (a) the authority or jurisdiction of the Department to enter into this [ACO], and (b) the terms or conditions hereof, except . . . in an [enforcement] action or proceeding brought by [DEP]" Further, as noted, among other stipulations in the 2019 ACO, Nicole-Kirstie voluntarily agreed to remediate and investigate the site for hazardous substances.

Also, N.J.A.C. 7:26E-1.8 defines "contaminated site" as "all portions of environmental media and any location where contamination is emanating, or which has emanated there from." And, we note that the 2019 ACO states that:

> Nicole-Kirstie shall remediate the Contaminated Site, including all discharges at the Site discovered during the remediation as the Department directs, pursuant to N.J.A.C. 7:26C-14.2(b)1, and according to this [ACO], the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31, the Administrative Requirements for the Remediation of Contaminated Sites, N.J.A.C. 7:26C, and the Technical Requirements for Site Remediation, N.J.A.C. 7:26E.

Further, N.J.A.C. 7:26E-18 lists the following definitions:

"Remedial action" means those actions taken at a contaminated site as may be required by the Department, including, without limitation, removal, treatment measures, containment, transportation, securing, or other engineering or institutional controls, whether to an unrestricted use or otherwise, designed to ensure that any contaminant is remediated in compliance with the applicable remediation standards. A remedial action continues as long as an engineering control or an institutional control is needed to protect the public health and safety and the environment, and until all unrestricted use remediation standards are met.

"Remedial investigation" means a process to determine the nature and extent of a discharge of a contaminant at a site or a discharge of a contaminant that has migrated or is migrating from the site and the problems presented by a discharge, and may include data collected, site characterization, sampling, monitoring, and the gathering of any other sufficient and relevant information necessary to determine the necessity for remedial action.

. . . .

"Remediation" or "remediate" means all necessary actions to investigate and cleanup or respond to any known, suspected, or threatened discharge, including, as necessary, the preliminary assessment, site investigation, remedial investigation and remedial action; provided, however, that "remediation" or "remediate" shall not include the payment of compensation for damage to, or loss of, natural resources.

Thus, there is no merit to Nicole-Kirstie's arguments that the 2019 ACO simply describes the scope of Nicole-Kirstie's overall responsibility in generic

46

terms or that it provides no independent basis for DEP's direction to sample and remediate the Maurice River sediments, or that res judicata bars DEP from requiring it to conduct any further sediment sampling in or near the Maurice River.

We similarly reject Nicole-Kirstie's arguments for application of the ECD. Nicole-Kirstie maintains the ECD applies because the same set of facts underlies both claims DEP asserted against it and Porreca as assignee. The entire controversy doctrine seeks to assure that all aspects of a controversy between parties to a litigation be included in a single litigation. Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 98 (2019); Olds v. Donnelly, 150 N.J. 424, 431 (1997). It is based on a "long-held preference that related claims and matters arising among related parties be adjudicated together rather than in separate, successive, fragmented, or piecemeal litigation." Kent Motor Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 443 (2011). It is codified at Rule 4:30A, which provides in relevant part:

> Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R[ule] 4:64-5 (foreclosure actions) and R[ule] 4:67-4(a) (leave required for counterclaims or cross-claims in summary actions).

Its goals are to "promote judicial efficiency, assure fairness to all parties with a material interest in an action, and encourage the conclusive determination of a legal controversy." Dimitrakopoulos, 237 N.J. at 98. Thus, when a party had a reasonable opportunity to fully litigate its claim in a prior action, the entire controversy doctrine may be invoked to bar the raising of that claim in a second proceeding. Karpovich v. Barbarula, 150 N.J. 473, 481 (1997). The doctrine, however, does not apply to "bar component claims that are either unknown, unarisen, or unaccrued at the time of the original action." Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, P.C., 321 N.J. Super. 275, 283 (App. Div. 1999). Accord Dimitrakopoulos, 237 N.J. at 99.

Here, the distinct accounting claims in the probate matter are not aspects of a single larger controversy involving the substance of Nicole-Kirstie's remedial investigation and remediation obligations, especially since Nicole-Kirstie is not questioning costs or payments from Wheaton's estate. Further, the entire controversy doctrine should not be applied "if such a remedy would be unfair in the totality of the circumstances and would not promote the doctrine's objectives of conclusive determinations, party fairness, and judicial economy and efficiency." Bank Leumi, 243 N.J. at 226 (quoting Dimitrakopoulos, 237 N.J. at 119). For the reasons already expressed, we are unconvinced applying

the ECD here based on the 2006 order support principles of finality or efficiency as to do so would impart factual findings and legal conclusions to the 2006 order that simply are not supported by the record of those proceedings. But more importantly, we find it would be fundamentally unfair to apply the doctrine here as it would preclude DEP from holding an indisputable responsible party from satisfying its environmental liabilities contrary to the ACO. Nothing in the record or the 2006 order warrants that result. Thus, the entire controversy doctrine does not apply to bar DEP's investigation and remediation requirements as established in the ACO.

We accordingly reject Nicole-Kristie's arguments and affirm the DEP's final agency action as expressed in its February 16, 2022 letter as we are convinced its decision was not arbitrary, capricious or unreasonable. Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1, 117 N.J. at 325.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division